# United States District Court   Northern District of Illinois
## APPLICATION FOR LEAVE TO APPEAR PRO HAC VICE

| | | |
|---|---|---|
| Case Title: | | Plaintiff(s) |
| Ronald Dwayne Smith | VS. | FILED<br>JUL 0 8 2008  NH<br>7-9-2008<br>MICHAEL W. DOBBINS<br>CLERK, U.S. DISTRICT COURT |
| Lisa Madigan, et al.  07cv 7048 | | Defendant(s) |
| Case Number:  07-CV-7048 | Judge: Matthew F. Kennelly | |

I,   Barbara H. Allen                                                    hereby apply to the Court

under Local Rule 83.14 for permission to appear and participate in the above-entitled action on behalf of

State of West Virginia and Darrell McGraw, Attorney General        by whom I have been retained.

I am a member in good standing and eligible to practice before the following courts:

| Title of Court | Date Admitted |
|---|---|
| West Virginia Supreme Court of Appeals | May 1978 |
| U.S. District Court, Southern District of West Virginia | May 1978 |
| U.S. District Court, Northern District of West Virginia | 1986 |
| United States Court of Appeals, Fourth Circuit | 1980 |

I have currently, or within the year preceding the date of this application, made pro hac vice applications to this Court in the following actions:

| Case Number | Case Title | Date of Application (Granted or Denied)* |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

*If denied, please explain:
(Attach additional form if
necessary)

Pursuant to Local Rule 83.15(a), applicants who do not have an office within the Northern District of Illinois must designate, at the time of filing their initial notice or pleading, a member of the bar of this Court having an office within this District upon who service of papers may be made.

Has the applicant designated local counsel?   Yes [ ]   No [X]

If you have not designated local counsel, Local Rule 83.15(b) provides that the designation must be made within thirty (30) days.

Has the applicant ever been:

| | | | |
|---|---|---|---|
| censured, suspended, disbarred, or otherwise disciplined by any court? | Yes ☐ | No ☒ |
| or is the applicant currently the subject of an investigation of the applicant's professional conduct? | Yes ☐ | No ☒ |
| transferred to inactive status, voluntarily withdrawn, or resigned from the bar of any court? | Yes ☐ | No ☒ |
| denied admission to the bar of any court? | Yes ☐ | No ☒ |
| held in contempt of court? | Yes ☒ | No ☐ |

NOTE: If the answer to *any* of the above questions is yes, please attach a brief description of the incident(s) and the applicant's current status before any court, or any agency thereof, where disciplinary sanctions were imposed, or where an investigation or investigations of the applicant's conduct may have been instituted.

I have read the Rules of Professional Conduct for the Northern District of Illinois, effective November 12, 1991 (Local Rules 83.50 through 83.58), and the Standards for Professional Conduct within the Seventh Federal Judicial Circuit, effective December 15, 1992, and will faithfully adhere to them. I declare under penalty of perjury that the foregoing is true and correct.

_July 1, 2008_
Date

_Barbara H. Allen_
Signature of Applicant

| Applicant's Name | Last Name | First Name | | Middle Name/Initial |
|---|---|---|---|---|
| | Allen | Barbara | | H. |
| Applicant's Law Firm | Office of the Attorney General | | | |
| Applicant's Address | Street Address | | | Room/Suite Number |
| | State Capitol, Room E-26 | | | |
| | City | State | ZIP Code | Work Phone Number |
| | Charleston | WV | 25305 | (304) 558-2021 |

**(The pro hac vice admission fee is $100.00 for cases filed before February 1, 2001, and $50.00 for cases filed on or after that date, and shall be paid to the Clerk. No admission under Rule 83.14 is effective until such time as the fee has been paid.)**

NOTE: Attorneys seeking to appear pro hac vice may wish to consider filing a petition for admission to the general bar of this Court. The fee for admission to the General Bar is $100.00 The fee for pro hac vice admission is $100.00 for cases filed before February 1, 2001, and $50.00 for cases filed on or after that date. Admission to the general bar permits an attorney to practice before this Court. Pro hac vice admission entitles an attorney to appear in a particular case only. Application for such admission must be made in each case; and the admission fee must be paid in each case.

(Fee Stamp)

PAID
RECEIPT # 4634 005566

JUL 0 9 2008

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**ORDER**

IT IS ORDERED that the applicant herein may appear in the above-entitled case.

DATED: _____    _____

United States District Judge

*STATE OF WEST VIRGINIA*

*I, Edythe A. Nash, Deputy Clerk of the Supreme Court of Appeals of West Virginia, hereby do certify that Barbara H. Allen, of Charleston, West Virginia, an attorney duly licensed to practice law in this State, was admitted to practice law before the Supreme Court of Appeals of West Virginia, the highest court of the State, on the 16th day of May, 1978, that she is an attorney in good standing in said Court and is currently on active status and that her private and professional characters are good.*

*Given under my hand and seal of said Court, at Charleston, West Virginia, this 12th day of June, 2008, and in the 145th year of the State.*



*Deputy Clerk, Supreme Court of Appeals of West Virginia*

BARBARA H. ALLEN
ADDENDUM TO POSITIVE CONTEMPT OF COURT INQUIRY

In January of 1996 I was retained to represent the Attorney General of West Virginia and the office of the Attorney General to conduct an investigation and prepare a report as to whether an employee had been properly terminated. The employee was African-American and alleged that her dismissal was unlawful racial discrimination.

In the course of unrelated litigation brought by a telemarketing company against the Attorney General, the company's lawyer subpoenaed my report and sought to depose me. I refused to answer many of the questions at my deposition, asserting the attorney-client privilege.

The district court held that I was required to answer the questions. I refused and was held in contempt.

On appeal, the United States Court of Appeals for the Fourth Circuit stayed the district court's ruling and then overturned it. The case is reported as In Re Allen, 106 F 3rd 582. A copy of the decision is attached, with the relevant portion of the decision beginning on page 21.



106 F.3d 582
106 F.3d 582, 36 Fed.R.Serv.3d 1196
**(Cite as: 106 F.3d 582)**

**H**
In re Allen
C.A.4 (W.Va.),1997.

United States Court of Appeals,Fourth Circuit.
In re Barbara H. ALLEN, Appellant.
BETTER GOVERNMENT BUREAU, INCOR-
PORATED, an Ohio Corporation, Plaintiff-Ap-
pellee,
v.
Darrell V. McGRAW, Jr., Attorney General, State
of West Virginia, Personally and in his Official Ca-
pacity; Better Government Bureau Office of the At-
torney General State of West Virginia, A Body
Politic, A Corporate Instrumentality of Government
with Limited Agency and Quasi-Sovereign Capa-
city; Ken Hechler, Secretary of State, in his Official
Capacity, Defendants,
v.
Donna WILLIS, Party in Interest.
BETTER GOVERNMENT BUREAU, INCOR-
PORATED, an Ohio Corporation, Plaintiff-Ap-
pellee,
v.
Darrell V. McGRAW, Jr., Attorney General, State
of West Virginia, Personally and in his Official Ca-
pacity, Defendant-Appellant.
BETTER GOVERNMENT BUREAU OFFICE OF
THE ATTORNEY GENERAL STATE OF WEST
VIRGINIA, A Body Politic, A Corporate Instru-
mentality of Government with Limited Agency and
Quasi-Sovereign Capacity; Ken Hechler, Secretary
of State, in his Official Capacity, Defendants,
v.
Barbara H. ALLEN; Donna Willis, Parties in In-
terest.
BETTER GOVERNMENT BUREAU, INCOR-
PORATED, an Ohio Corporation, Plaintiff-Ap-
pellee,
v.
Darrell V. McGRAW, Jr., Attorney General, State
of West Virginia, Personally and in his Official Ca-
pacity, Defendant-Appellant.

BETTER GOVERNMENT BUREAU OFFICE OF
THE ATTORNEY GENERAL STATE OF WEST
VIRGINIA, A Body Politic, A Corporate Instru-
mentality of Government with Limited Agency and
Quasi-Sovereign Capacity; Ken Hechler, Secretary
of State, in his Official Capacity, Defendants,
v.
Barbara H. ALLEN; Donna Willis, Parties in In-
terest.
**Nos. 96-1464, 96-1601 and 96-1652.**

Argued July 9, 1996.
Decided Feb. 6, 1997.

"Watchdog" association filed complaint against
state Attorney General, state Secretary of State, and
corporate entity created by Attorney General, al-
leging state and federal unfair competition claims
and denial of association's right to free speech. Fol-
lowing denial of Attorney General's motion for
summary judgment based on qualified immunity
defense, 904 F.Supp. 540, and following vacatur of
such order, the United States District Court for the
Southern District of West Virginia, Charles H.
Haden, II, Chief Judge, 924 F.Supp. 724, reinstated
such order. Attorney General appealed. The same
court, 924 F.Supp. 729, found Attorney General's
outside counsel in contempt for refusing on basis of
attorney-client privilege to provide information
ordered by court. Outside counsel appealed. Ap-
peals were consolidated. The Court of Appeals, Di-
ana Gribbon Motz, Circuit Judge, held that: (1) as
matter of first impression, public official who per-
forms act clearly established to be beyond scope of
his or her discretionary authority is not entitled to
claim qualified immunity under § 1983; (2) Attor-
ney General performed act clearly established to be
beyond his authority when he established
"government agency corporation," and he thus was
not qualifiedly immune from § 1983 action; (3) At-
torney General obtained outside counsel in outside
counsel's capacity as attorney, and Attorney Gener-
al's communications with her thus were subject to
attorney-client privilege; (4) communications

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 F.3d 582
106 F.3d 582, 36 Fed.R.Serv.3d 1196
(Cite as: 106 F.3d 582)

Page 2

between former employee of Attorney General and outside counsel were subject to attorney-client privilege; (5) contested portions of summary of interview between Secretary of State and outside counsel constituted opinion work product; and (6) selection and arrangement of personnel records by outside counsel constituted opinion work product.

Affirmed in part; reversed and remanded in part.

Niemeyer, Circuit Judge, concurred in part, dissented in part, and filed opinion.

West Headnotes

**[1] Civil Rights 78 ⟶1373**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1373 k. In General. Most Cited Cases
    (Formerly 78k211.1)
If parties seeking immunity from § 1983 claim were shielded from tort liability when Congress enacted § 1983, court infers from legislative silence that Congress did not intend to abrogate such immunities when it imposed liability for actions taken under color of state law; additionally, irrespective of the common-law support, court will not recognize immunity available at common law if § 1983's history or purpose counsel against applying it in § 1983 actions. 42 U.S.C.A. § 1983.

**[2] Civil Rights 78 ⟶1376(1)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
                78k1376(1) k. In General. Most Cited Cases
    (Formerly 78k214(1))
American rather than English common-law tradition is relevant to determination of whether public

officials were shielded from tort liability for certain acts when § 1983 was enacted in 1871, so as to create inference from legislative silence that Congress did not intend to abrogate such immunities upon enacting § 1983. 42 U.S.C.A. § 1983.

**[3] Civil Rights 78 ⟶1376(1)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
                78k1376(1) k. In General. Most Cited Cases
    (Formerly 78k214(1))
Once a court has established state of common law at time Congress enacted § 1983, it must examine history and purpose of § 1983 and special policy concerns involved in suing public officials to determine whether public officials are immune from liability for certain acts under § 1983. 42 U.S.C.A. § 1983.

**[4] Civil Rights 78 ⟶1376(2)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
                78k1376(2) k. Good Faith and Reasonableness; Knowledge and Clarity of Law; Motive and Intent, in General. Most Cited Cases
    (Formerly 78k214(2))
Public official who performs act clearly established to be beyond scope of his or her discretionary authority is not entitled to claim qualified immunity under § 1983. 42 U.S.C.A. § 1983.

**[5] Civil Rights 78 ⟶1407**

78 Civil Rights
    78III Federal Remedies in General

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 F.3d 582
106 F.3d 582, 36 Fed.R.Serv.3d 1196
**(Cite as: 106 F.3d 582)**

Page 3

78k1400 Presumptions, Inferences, and Burdens of Proof
78k1407 k. Defenses; Immunity and Good Faith. Most Cited Cases
(Formerly 78k240(5))
Public official bears burden of demonstrating that conduct complained of in § 1983 action falls within scope of official's duties, such that official is entitled to claim qualified immunity. 42 U.S.C.A. § 1983.

**[6] Civil Rights 78 ☞1376(2)**

78 Civil Rights
78III Federal Remedies in General
78k1372 Privilege or Immunity; Good Faith and Probable Cause
78k1376 Government Agencies and Officers
78k1376(2) k. Good Faith and Reasonableness; Knowledge and Clarity of Law; Motive and Intent, in General. Most Cited Cases
(Formerly 78k214(2))
Public official's conduct falls within his or her authority, such that official is entitled to qualified immunity in § 1983 action, unless a reasonable official in the official's position would have known that the conduct was clearly established to be beyond scope of that authority. 42 U.S.C.A. § 1983.

**[7] Civil Rights 78 ☞1376(2)**

78 Civil Rights
78III Federal Remedies in General
78k1372 Privilege or Immunity; Good Faith and Probable Cause
78k1376 Government Agencies and Officers
78k1376(2) k. Good Faith and Reasonableness; Knowledge and Clarity of Law; Motive and Intent, in General. Most Cited Cases
(Formerly 78k214(2))
In determination of scope of public official's authority, and whether act complained of was clearly established to be beyond that authority, such that official is not qualifiedly immune from § 1983

claim, the issue is neither whether official properly exercised his or her discretionary duties, nor whether he or she violated the law. 42 U.S.C.A. § 1983.

**[8] Civil Rights 78 ☞1376(2)**

78 Civil Rights
78III Federal Remedies in General
78k1372 Privilege or Immunity; Good Faith and Probable Cause
78k1376 Government Agencies and Officers
78k1376(2) k. Good Faith and Reasonableness; Knowledge and Clarity of Law; Motive and Intent, in General. Most Cited Cases
(Formerly 78k214(2))
In determining scope of public official's authority, and whether act complained of was clearly established to be beyond that authority, such that official is not qualifiedly immune from § 1983 claim, court must ask whether act complained of, if done for proper purpose, would be within, or reasonably related to, outer perimeter of official's discretionary duties. 42 U.S.C.A. § 1983.

**[9] Civil Rights 78 ☞1376(1)**

78 Civil Rights
78III Federal Remedies in General
78k1372 Privilege or Immunity; Good Faith and Probable Cause
78k1376 Government Agencies and Officers
78k1376(1) k. In General. Most Cited Cases
(Formerly 78k214(1))
Scope of public official's immunity from § 1983 claim should be determined by relation of injury complained of to duties entrusted to officer. 42 U.S.C.A. § 1983.

**[10] Civil Rights 78 ☞1376(9)**

78 Civil Rights
78III Federal Remedies in General
78k1372 Privilege or Immunity; Good Faith

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 F.3d 582
106 F.3d 582, 36 Fed.R.Serv.3d 1196
**(Cite as: 106 F.3d 582)**

and Probable Cause
    78k1376 Government Agencies and Officers
        78k1376(9) k. Attorney General and Prosecuting Attorneys. Most Cited Cases
    (Formerly 78k214(9))
In determination of whether state Attorney General was qualifiedly immune from § 1983 claim, the proper scope of his duties upon which to focus was whether he exceeded his authority by forming corporation under auspices of Attorney General's office, not whether he exceeded scope of his authority by forming corporation in retaliation for speech critical of him. 42 U.S.C.A. § 1983.

**[11] Civil Rights 78 €═►1376(2)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
        78k1376 Government Agencies and Officers
            78k1376(2) k. Good Faith and Reasonableness; Knowledge and Clarity of Law; Motive and Intent, in General. Most Cited Cases
    (Formerly 78k214(2))
Whether public official's act was clearly established to be beyond scope of his or her authority when act was committed, such that official is not immune from § 1983 claim based on act, depends upon review of laws or regulations that governed his or her position at time of act; any relevant case law should also be considered and given due weight. 42 U.S.C.A. § 1983.

**[12] Attorney General 46 €═►6**

46 Attorney General
    46k5 Powers and Duties
        46k6 k. In General. Most Cited Cases
Under West Virginia law, powers and duties of Attorney General are limited to those specified by Constitution and by rules of law prescribed pursuant thereto. W.Va.Const. Art. 7, § 1.

**[13] Statutes 361 €═►188**

361 Statutes
    361VI Construction and Operation
        361VI(A) General Rules of Construction
            361k187 Meaning of Language
                361k188 k. In General. Most Cited Cases
Under West Virginia law, where language of statute is clear and without ambiguity, the plain meaning is to be accepted.

**[14] Constitutional Law 92 €═►2621**

92 Constitutional Law
    92XX Separation of Powers
        92XX(D) Executive Powers and Functions
            92k2621 k. Encroachment on Legislature. Most Cited Cases
    (Formerly 92k50)
Under West Virginia law, the legislature, rather than its executive branch or any member of that branch, is the body vested with power to create government corporations.

**[15] States 360 €═►84**

360 States
    360II Government and Officers
        360k84 k. Corporations Controlled by State. Most Cited Cases
Under West Virginia law, public corporation is instrumentality of state, founded and owned by state in the public interest, supported by public funds, and governed by managers deriving their authority from state.

**[16] Attorney General 46 €═►6**

46 Attorney General
    46k5 Powers and Duties
        46k6 k. In General. Most Cited Cases
Under West Virginia law, duties of Attorney General are narrowly limited.

**[17] Attorney General 46 €═►6**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 F.3d 582
106 F.3d 582, 36 Fed.R.Serv.3d 1196
**(Cite as: 106 F.3d 582)**

46 Attorney General
    46k5 Powers and Duties
        46k6 k. In General. Most Cited Cases
Under West Virginia law, Attorney General is not
chief law enforcement officer of state.

**[18] Attorney General 46 ☞6**

46 Attorney General
    46k5 Powers and Duties
        46k6 k. In General. Most Cited Cases
Under West Virginia law, Attorney General's role is
not to make public policy in his or her own right on
behalf of state.

**[19] Attorney General 46 ☞6**

46 Attorney General
    46k5 Powers and Duties
        46k6 k. In General. Most Cited Cases
Under West Virginia law, Attorney General's stat-
utory authority does not authorize him or her to as-
sert his or her vision of state interest.

**[20] Civil Rights 78 ☞1376(9)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith
and Probable Cause
            78k1376 Government Agencies and Of-
ficers
                78k1376(9) k. Attorney General and
Prosecuting Attorneys. Most Cited Cases
    (Formerly 78k214(9))
West Virginia's Attorney General performed act
clearly established to be beyond his authority when
he established "government agency corporation,"
and he thus was not qualifiedly immune from §
1983 action arising from such act. W.Va.Const.
Art. 7, § 1; 42 U.S.C.A. § 1983; W.Va.Code
46A-7-102(1).

**[21] Witnesses 410 ☞198(1)**

410 Witnesses
    410II Competency

        410II(D) Confidential Relations and Priv-
ileged Communications
            410k197 Communications to or Advice by
Attorney or Counsel
                410k198 In General
                    410k198(1) k. In General. Most
Cited Cases
Like all privileges, attorney-client privilege inter-
feres with truth-seeking mission of the legal pro-
cess, and therefore is not favored.

**[22] Witnesses 410 ☞198(1)**

410 Witnesses
    410II Competency
        410II(D) Confidential Relations and Priv-
ileged Communications
            410k197 Communications to or Advice by
Attorney or Counsel
                410k198 In General
                    410k198(1) k. In General. Most
Cited Cases
If party demonstrates that attorney-client privilege
applies, the privilege affords all communications
between attorney and client absolute and complete
protection from disclosure.

**[23] Witnesses 410 ☞198(1)**

410 Witnesses
    410II Competency
        410II(D) Confidential Relations and Priv-
ileged Communications
            410k197 Communications to or Advice by
Attorney or Counsel
                410k198 In General
                    410k198(1) k. In General. Most
Cited Cases
Party asserting attorney-client privilege must
demonstrate: (1) asserted holder is or sought to be-
come client; (2) person to whom communication
was made (a) is member of bar of a court, or his or
her subordinate and (b) in connection with commu-
nication is acting as lawyer; (3) communication
relates to fact of which attorney was informed (a)
by client (b) without presence of strangers (c) for

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 F.3d 582
106 F.3d 582, 36 Fed.R.Serv.3d 1196
(Cite as: 106 F.3d 582)

Page 6

purpose of securing primarily either (i) opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for purpose of committing crime or tort; and (4) privilege has been (a) claimed and (b) not waived by client.

**[24] Federal Courts 170B ⇐⇒870.1**

170B Federal Courts
  170BVIII Courts of Appeals
    170BVIII(K) Scope, Standards, and Extent
      170BVIII(K)5 Questions of Fact, Verdicts and Findings
        170Bk870 Particular Issues and Questions
          170Bk870.1 k. In General. Most Cited Cases
To the extent district court's holding that attorney-client privilege does not protect communications rests essentially on determinations of fact, Court of Appeals reviews those determinations for clear error.

**[25] Federal Courts 170B ⇐⇒776**

170B Federal Courts
  170BVIII Courts of Appeals
    170BVIII(K) Scope, Standards, and Extent
      170BVIII(K)1 In General
        170Bk776 k. Trial De Novo. Most Cited Cases
To extent district court's holding that attorney-client privilege does not protect communications rests on application of controlling legal principles to facts, Court of Appeals reviews such holding de novo.

**[26] Witnesses 410 ⇐⇒200**

410 Witnesses
  410II Competency
    410II(D) Confidential Relations and Privileged Communications
      410k197 Communications to or Advice by Attorney or Counsel
        410k200 k. Professional Character of Employment or Transaction. Most Cited Cases

Fact that attorney's duties were investigative in nature did not compel finding that attorney-client privilege did not apply to communications between investigating attorney and client.

**[27] Witnesses 410 ⇐⇒200**

410 Witnesses
  410II Competency
    410II(D) Confidential Relations and Privileged Communications
      410k197 Communications to or Advice by Attorney or Counsel
        410k200 k. Professional Character of Employment or Transaction. Most Cited Cases
In determining whether communications between attorney and client were subject to attorney-client privilege, the relevant question was not whether attorney was retained to conduct investigation, but rather, whether this investigation was related to rendition of legal services.

**[28] Witnesses 410 ⇐⇒200**

410 Witnesses
  410II Competency
    410II(D) Confidential Relations and Privileged Communications
      410k197 Communications to or Advice by Attorney or Counsel
        410k200 k. Professional Character of Employment or Transaction. Most Cited Cases
Attorney General obtained outside counsel in outside counsel's capacity as attorney when Attorney General hired her to conduct investigation of possible document mismanagement in his office, and communications between her and members of his office thus were subject to attorney-client privilege, where engagement letter indicated that she was to prepare report and recommendations, and she spent majority of her time on legal tasks as opposed to investigation.

**[29] Witnesses 410 ⇐⇒204(2)**

410 Witnesses

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 F.3d 582
106 F.3d 582, 36 Fed.R.Serv.3d 1196
**(Cite as: 106 F.3d 582)**

410II Competency
410II(D) Confidential Relations and Privileged Communications
410k197 Communications to or Advice by Attorney or Counsel
410k204 Mode or Form of Communications
410k204(2) k. Existence, Contents, or Production of Documents. Most Cited Cases
Attorney-client privilege is never available to allow client to funnel its papers and documents into hands of its lawyers for custodial purposes and thereby avoid disclosure.

**[30] Witnesses 410 €══199(2)**

410 Witnesses
410II Competency
410II(D) Confidential Relations and Privileged Communications
410k197 Communications to or Advice by Attorney or Counsel
410k199 Relation of Attorney and Client
410k199(2) k. Parties and Interests Represented by Attorney. Most Cited Cases
Analysis of *Upjohn Co. v. U.S.*, for determining which employees fall within scope of attorney-client privilege applicable to communications between attorney and employer, applies equally to former employees.

**[31] Witnesses 410 €══199(2)**

410 Witnesses
410II Competency
410II(D) Confidential Relations and Privileged Communications
410k197 Communications to or Advice by Attorney or Counsel
410k199 Relation of Attorney and Client
410k199(2) k. Parties and Interests Represented by Attorney. Most Cited Cases
Communications between former employee of state Attorney General, and outside counsel that had

been hired by Attorney General, were subject to attorney-client privilege, where Attorney General had employed employee during time period at issue, former employee possessed relevant information, and outside counsel had interviewed former employee at direction of her client, in order to provide legal advice to client.

**[32] Witnesses 410 €══199(2)**

410 Witnesses
410II Competency
410II(D) Confidential Relations and Privileged Communications
410k197 Communications to or Advice by Attorney or Counsel
410k199 Relation of Attorney and Client
410k199(2) k. Parties and Interests Represented by Attorney. Most Cited Cases
Attorney-client privilege applicable to communications between state Attorney General and his outside counsel did not protect employment records of secretary who allegedly disclosed confidential information while employed by Attorney General where, although attorneys in Attorney General's office created portions of such records, records did not contain communications by those attorneys to outside counsel for her legal advice.

**[33] Federal Civil Procedure 170A €══1600(3)**

170A Federal Civil Procedure
170AX Depositions and Discovery
170AX(E) Discovery and Production of Documents and Other Tangible Things
170AX(E)3 Particular Subject Matters
170Ak1600 Privileged Matters in General
170Ak1600(3) k. Work Product of Attorney. Most Cited Cases
In contrast to fact work product, which is discoverable upon showing of both substantial need and inability to secure substantial equivalent of materials by alternate means without undue hardship, opinion work product enjoys nearly absolute immunity and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 F.3d 582
106 F.3d 582, 36 Fed.R.Serv.3d 1196
(Cite as: 106 F.3d 582)

can be discovered only in very rare and extraordinary circumstances.

**[34] Federal Civil Procedure 170A ☞1600(3)**

170A Federal Civil Procedure
    170AX Depositions and Discovery
        170AX(E) Discovery and Production of Documents and Other Tangible Things
            170AX(E)3 Particular Subject Matters
                170Ak1600 Privileged Matters in General
                    170Ak1600(3) k. Work Product of Attorney. Most Cited Cases
Once threshold requirement, that document was created in anticipation of litigation, has been met, "opinion work product" is that which contains attorney's mental impressions, conclusions, opinions, or legal theories concerning the litigation.

**[35] Federal Civil Procedure 170A ☞1600(3)**

170A Federal Civil Procedure
    170AX Depositions and Discovery
        170AX(E) Discovery and Production of Documents and Other Tangible Things
            170AX(E)3 Particular Subject Matters
                170Ak1600 Privileged Matters in General
                    170Ak1600(3) k. Work Product of Attorney. Most Cited Cases
Opinion work product is absolutely immune from discovery, whether it was actually prepared by the attorney or another representative of the party.

**[36] Federal Civil Procedure 170A ☞1600(3)**

170A Federal Civil Procedure
    170AX Depositions and Discovery
        170AX(E) Discovery and Production of Documents and Other Tangible Things
            170AX(E)3 Particular Subject Matters
                170Ak1600 Privileged Matters in General
                    170Ak1600(3) k. Work Product of Attorney. Most Cited Cases

Contested portions of summary of interview between state Secretary of State and outside counsel hired by state Attorney General constituted opinion work product, where summary was prepared in anticipation of litigation between Attorney General and "watchdog group," and summary tended to indicate focus of counsel's investigation into possible document mismanagement in connection with discovery in such litigation and, hence, her theories and opinions regarding litigation.

**[37] Federal Civil Procedure 170A ☞1600(3)**

170A Federal Civil Procedure
    170AX Depositions and Discovery
        170AX(E) Discovery and Production of Documents and Other Tangible Things
            170AX(E)3 Particular Subject Matters
                170Ak1600 Privileged Matters in General
                    170Ak1600(3) k. Work Product of Attorney. Most Cited Cases
Selection and arrangement of personnel records, by outside counsel who had been hired by state Attorney General to investigate possible document mismanagement in connection with discovery in litigation between Attorney General and "watchdog group," constituted opinion work product.

**\*586 ARGUED:** David Paul Cleek, McQueen, Harmon, Potter & Cleek, Charleston, WV; James Anthony McKowen, Allen & Allen, L.C., Charleston, WV, for Appellants. Roger Patrick Furey, Arter & Hadden, Washington, D.C., for Appellees. **ON BRIEF:** Marilyn T. McClure, Cleek, Pullin, Knopf & Fowler, Charleston, West Virginia, for Appellants. Michael B. Adlin, Arter & Hadden, Washington, D.C.; E. Joseph Buffa, Charleston, WV, for Appellees.

Before NIEMEYER, MICHAEL, and MOTZ, Circuit Judges.

No. 96-1652 affirmed and No. 96-1464 and No. 96-1601 reversed and remanded by published opinion. Judge MOTZ wrote the majority opinion, in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 F.3d 582
106 F.3d 582, 36 Fed.R.Serv.3d 1196
(Cite as: 106 F.3d 582)

which Judge MICHAEL concurred. Judge NIEMEYER wrote an opinion concurring in part and dissenting in part.

## OPINION

DIANA GRIBBON MOTZ, Circuit Judge:
Against a background of drama and intrigue, the Attorney General of West Virginia claims qualified immunity and his outside *587 counsel asserts, on the Attorney General's behalf, attorney-client privilege. We affirm the district court's refusal to grant qualified immunity to the Attorney General, because he engaged in activity a reasonable official in his position would have known was clearly established to be beyond the scope of his authority. However, because the Attorney General's outside counsel properly relied on the opinion work product doctrine and, at her client's behest, the attorney-client privilege, in refusing to answer certain deposition questions and produce certain documents, we reverse the district court's order finding outside counsel in contempt.

### I.

### A.

The first major question raised in these consolidated cases, the qualified immunity question, revolves around a non-profit organization known as the Better Government Bureau, Inc. (BGB) and its efforts to incorporate under that name in the State of West Virginia.

BGB has been incorporated in the State of Ohio since August 1993, and in the State of Washington since early 1994. A government "watchdog" association, BGB's members include approximately forty-seven businesses and 304 individuals from various states. In addition, BGB works with various advocacy groups, including the Heritage Foundation, the National Vietnam Veteran's Coalition, and the Christian Coalition. BGB's mission is "to make government more efficient, responsive and less corrupt" by working for lower taxes, fewer restrictions on free enterprise, and less bureaucracy. BGB monitors and investigates government activities, and disseminates information about government policies affecting businesses, focussing particularly on complaints from its members.

In August 1994, Suarez Corporation Industries (SCI) lodged a complaint with BGB regarding West Virginia Attorney General Darrell McGraw and his Office. SCI is one of BGB's most active members and its largest source of membership dues. The Attorney General's Office had filed suit against one of SCI's subsidiaries for fraudulent activities and violations of West Virginia's Consumer Credit and Protection Act, W. Va.Code §§ 46A-1-101 to 46A-8-102. SCI asserted that the investigation and prosecution of these violations were improper and raised questions about abuse of power. BGB attempted to investigate this complaint by requesting information from the Attorney General under the West Virginia Freedom of Information Act, W. Va.Code §§ 29B-1-1 to 29B-1-7. The Attorney General assertedly refused to provide the requested information.

In the face of what it considered stonewalling, BGB decided to go public with its dispute with the Attorney General. BGB broadcast the following announcement on three area radio stations on September 8, 1994:

THIS IS AN IMPORTANT ANNOUNCEMENT

The Better Government Bureau is investigating the actions of Attorney's [sic ] General Darrell McGraw and [Assistant Attorney General] Tom Rodd.

Voters already removed McGraw from the State Supreme Court because of his poor performance.

Now we are trying to obtain public information about the Attorney General under the "Freedom of Information Act", but it has been denied. What are

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 F.3d 582
106 F.3d 582, 36 Fed.R.Serv.3d 1196
(Cite as: 106 F.3d 582)

McGraw and Rodd trying to hide?

If you have any information about Darrell McGraw, Tom Rodd or anyone in the Attorney General's office, please contact the Better Government Bureau toll free at 1-800-807-9881. The number again is 1-800-807-9881.

PAID FOR BY THE BETTER GOVERNMENT BUREAU.

Subsequently, an article about BGB appeared in the *Charleston Gazette*. The article paraphrased a BGB newsletter's criticism of McGraw and Rodd, and indicated that BGB intended to "open a West Virginia office and possibly start a West Virginia chapter." The newspaper quotes BGB's president, Kenneth Nickalo, as saying "[w]e're sick of the state government of West Virginia.... We think we can crack politics in West Virginia, use what we do in West Virginia as a *588 model, and do what we'll do in West Virginia in other states."

A week after this article appeared in the *Charleston Gazette,* Attorney General McGraw instructed an employee, Lila Hill, to reserve the corporate name, "Better Government Bureau," with the West Virginia Secretary of State's Office pursuant to W. Va.Code § 31-1-12 (allowing reservation of the "exclusive right to the use of a corporate name"). When Hill attempted to reserve the name "Better Government Bureau," she was informed that anyone seeking to reserve that name had to see Mr. Wilkes, the Director of the Corporations Division of the Secretary of State's Office. Wilkes, who had placed an "administrative flag" on the name because Secretary of State Ken Hechler "had an interest in" it, was unavailable. Hill returned to the Attorney General's office and informed McGraw that she had been unable to see Wilkes or to reserve the name. McGraw instructed Hill to return to the Secretary of State's Office and to see Secretary of State Hechler personally about reserving the Better Government Bureau name.

Hill returned and met with Secretary of State

Hechler, who personally escorted her back to the Corporations Division; Hill then reserved the name "Better Government Bureau." Later that same day, Hill and McGraw completed the necessary forms, and Hill went to the office of the County Clerk to file articles of incorporation for a new corporation with the name, "Better Government Bureau, State of West Virginia, a Government Agency Corporation." McGraw used personal funds to pay for the incorporation fee.

About a month later, BGB followed through on its plans to open a West Virginia chapter and applied for certification as a foreign corporation doing business in West Virginia. The Secretary of State's Office rejected BGB's application, however, because another entity (the Attorney General's) had already incorporated in West Virginia using "Better Government Bureau" as part of its name.

Nickalo, BGB's president, sent letters to both McGraw and Hechler requesting that they take appropriate steps to eliminate the obstacles to BGB's incorporation. Although McGraw did amend his corporation's articles of incorporation to modify its name slightly, he did not remove the words "Better Government Bureau" from the name.[FN1] Thus BGB remained unable to incorporate or register to do business as a foreign corporation in West Virginia under its chosen name.

> FN1. The entity's name has undergone several changes. The current name is "Better Government Bureau Office of the Attorney General State of West Virginia a body politic a corporate instrumentality of government with limited agency and quasi-sovereign capacity."

At the same time BGB was attempting to incorporate in West Virginia, Attorney General McGraw wrote to other state attorneys general about BGB. On October 4, 1994, he sent a letter to the attorneys general of all forty-nine other states, in which he advised them:

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 F.3d 582
106 F.3d 582, 36 Fed.R.Serv.3d 1196
**(Cite as: 106 F.3d 582)**

Page 11

If your office becomes involved in a sweepstakes probe, you will encounter this corporation. To foreclose the possibility of such a corporation operating in your State, you may want to register the name of the Better Government Bureau as an agent for the Attorney General's Office with the Secretary of State's Office or take other preventative measures.

Two days later, McGraw sent another letter to the same recipients, this time by facsimile. This letter alleged that an SCI attorney had "threatened violence" upon Deputy Attorney General Rodd, and advised:

When you come up against these people, you should know that there is a possibility that their *modus operandi* might include a proclivity to violence.

Please recall my recent letter, in which I recommend that you protect the name Better Government Bureau in your State, otherwise when you act to protect your consumers you will be attacked by a Better Government Bureau for doing so.

On October 28, 1994, BGB filed suit in federal court against Attorney General McGraw, personally and in his official capacity, the "government agency" BGB, and Secretary of State Hechler, in his official capacity. BGB alleged: (1) McGraw and Hechler *589 violated BGB's rights of free speech under the federal and state constitutions; and (2) all of the defendants infringed on BGB's trade name and service mark in violation of the Lanham Act, 15 U.S.C. § 1125(a), and the common law. BGB sought injunctive relief, money damages, and attorneys fees; although, on the constitutional claims brought pursuant to 42 U.S.C. § 1983, BGB sought money damages only against McGraw.

Following discovery, the parties filed cross motions for summary judgment. On September 16, 1995, the district court issued a thorough opinion addressing those motions. *See Better Gov't Bureau v. McGraw*, 904 F.Supp. 540 (S.D.W.Va.1995). The court granted summary judgment to Hechler, the government

agency BGB, and McGraw, in his official capacity, on their Eleventh Amendment immunity defenses to BGB's "state law causes of action." *Id.* at 553. The court denied all other motions for summary judgment, including that based on McGraw's defense of qualified immunity to BGB's federal constitutional claims against McGraw in his personal capacity. *Id.* at 549-54. McGraw appealed the qualified immunity ruling; BGB did not cross appeal.

In December 1995, while the qualified immunity appeal was pending, BGB became aware of the existence of a highly relevant memorandum that the defendants had failed to identify or produce during discovery. BGB had received this memorandum from Donna Willis, a secretary in the Attorney General's Office, who McGraw subsequently fired. The memorandum was written by Daynus Jividen, a top McGraw aide, to Secretary of State Hechler.

The memorandum, dated September 26, 1994, reads as follows:

The Attorney General's Office anticipates that an organization called the Better Government Bureau, out of Canton, Ohio, will shortly seek registration through your office, in order to conduct its alleged business in the State of West Virginia. When the Better Government Bureau attempts registration the Attorney General requests your office to resist and refuse such registration on the grounds that the Better Government Bureau's attempt to ply its business in our state constitutes a fraud and a deceit.

Also, please inform me when the organization's application is received by your office. Thank you for your attention to this matter.

The Jividen memorandum, written on McGraw's letterhead, indicates that copies were sent to McGraw and Assistant Attorney General Francis Hughes.

On December 29, 1995, BGB's attorneys informed McGraw's counsel that BGB had obtained a copy of the Jividen memorandum. McGraw's attorneys then

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 F.3d 582
106 F.3d 582, 36 Fed.R.Serv.3d 1196
(Cite as: 106 F.3d 582)

produced to BGB's attorneys Secretary of State Hechler's reply to the Jividen memorandum, which reads:

In response to your memorandum of September 26, and after personal discussion with the Attorney General, I will be pleased to inform you when the Better Government Bureau actually attempts to register with the Secretary of State's office. The issue of resisting and refusing such registration is more complicated tha[n] I at first imagined.

I do not recall any instance when any organization has been denied registration because of its political activity. You[r] memorandum refers to the BGB's "attempt to ply its business in our state [as] constitut[ing] a fraud and a deceit." Without passing judgment as to whether this would constitute sufficient grounds for resisting and refusing registration, I would ask that you spell out in writing the fraud and deceit to which you refer in your September 26 memorandum.

Hechler never received any support for the Jividen memorandum's allegations of fraud and deceit.

On January 5, 1996, in response to Donna Willis' leak of the Jividen memorandum to BGB, the Attorney General retained outside counsel, Barbara H. Allen, Esquire. Allen was engaged to investigate possible document mismanagement and confidentiality breaches in the Attorney General's Office and to prepare a written report of her findings and recommendations.

*590 A few days later, BGB requested that the district court reopen discovery to determine the circumstances surrounding the Jividen memorandum, the Hechler reply, and their nonproduction. On January 10, 1996, the district court granted BGB's motion, provided this court agreed to remand the case for further discovery. After we granted the parties' stipulated motion to remand, the district court vacated its October 1995 order denying McGraw summary judgment on qualified immunity grounds, and reopened discovery on that issue.

During the next few weeks, BGB deposed McGraw, Jividen, Hechler, and others. As is more fully discussed in section II.A., BGB also attempted to depose outside counsel Allen as to the results of her investigation. Although ordered to do so by the district court, Allen relied on the opinion work product doctrine, and, on her client's behalf, asserted attorney-client privilege and refused to answer certain questions or disclose certain documents. On April 25, 1996, the district court ultimately found her in contempt.

That same day, the district court issued a supplemental memorandum opinion with regard to McGraw's qualified immunity defense, reinstating its October 1995 order denying McGraw qualified immunity. McGraw appealed and we consolidated his appeal with the appeals from the contempt order.

B.

Attorney General McGraw seeks refuge in the well-established doctrine of qualified immunity: "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).

The district court rejected McGraw's claim to qualified immunity, reasoning that McGraw's actions in creating his own "governmental agency," Better Government Bureau corporation, "were beyond the permissible realm of his discretionary duties and thus outside the scope of his responsibility." *Better Gov't,* 904 F.Supp. at 553 n. 17. For this reason, the court held McGraw was "not entitled to qualified immunity." *Id.*[FN2] The Eleventh, Second, and Ninth Circuits, as well as the Western District of Virginia, have similarly held that an official acting beyond the scope of his authority may not claim qualified immunity. *Shechter v. Comptroller of New York,* 79 F.3d 265, 268-70 (2d Cir.1996); *Lenz v.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Winburn*, 51 F.3d 1540, 1545-47 (11th Cir.1995); *Merritt v. Mackey*, 827 F.2d 1368, 1373 (9th Cir.1987); *Front Royal and Warren County Indus. Park Corp. v. Town of Front Royal*, 922 F.Supp. 1131, 1142 (W.D.Va.1996). However, this question is one of first impression in this court.

> FN2. The court also concluded that BGB alleged a violation of clearly established First Amendment rights, and that a reasonable person in McGraw's position would have known that his alleged conduct violated these rights. *Better Gov't*, 904 F.Supp. at 552-53. In view of our conclusion that McGraw exceeded the scope of his authority, we need not address this issue.

[1] The Supreme Court has discussed the proper standard to apply when analyzing § 1983 immunity questions:

Section 1983 "creates a species of tort liability that on its face admits of no immunities." *Imbler v. Pachtman*, 424 U.S. 409, 417 [96 S.Ct. 984, 988-89, 47 L.Ed.2d 128] (1976). Nonetheless, we have accorded certain government officials either absolute or qualified immunity from suit if the "tradition of immunity was so firmly rooted in the common law and was supported by such strong policy reasons that 'Congress would have specifically so provided had it wished to abolish the doctrine.' " *Owen v. City of Independence*, 445 U.S. 622, 637 [100 S.Ct. 1398, 1408, 63 L.Ed.2d 673] (1980) (quoting *Pierson v. Ray*, 386 U.S. 547, 555 [87 S.Ct. 1213, 1218, 18 L.Ed.2d 288] (1967)). If parties seeking immunity were shielded from tort liability when Congress enacted the Civil Rights Act of 1871- § 1 of which is codified at 42 U.S.C. § 1983-we infer from legislative silence that Congress did not intend to abrogate such immunities when it imposed liability for actions taken under color of state law. See *591 *Tower v. Glover*, 467 U.S. 914, 920 [104 S.Ct. 2820, 2824-25, 81 L.Ed.2d 758] (1984); *Imbler, supra*, 424 U.S., at 421 [96 S.Ct., at 990-91]; *Pulliam v. Allen*, 466 U.S. 522, 529, 104 S.Ct. 1970, 1974, 80 L.Ed.2d

565 (1984). Additionally, irrespective of the common law support, we will not recognize an immunity available at common law if § 1983's history or purpose counsel against applying it in § 1983 actions. *Tower, supra*, 467 U.S., at 920 [104 S.Ct., at 2824-25]. See also *Imbler, supra* 424 U.S., at 424-29 [96 S.Ct., at 992-94].

*Wyatt v. Cole*, 504 U.S. 158, 163-4, 112 S.Ct. 1827, 1831, 118 L.Ed.2d 504 (1992) (parallel citations omitted). *See also Malley v. Briggs*, 475 U.S. 335, 339-40, 106 S.Ct. 1092, 1095, 89 L.Ed.2d 271 (1986) ("Our initial inquiry [regarding immunity under § 1983] is whether an official claiming immunity under § 1983 can point to a common-law counterpart to the privilege he asserts. If an official was accorded immunity from tort actions at common law when the Civil Rights Act was enacted in 1871, the Court next considers whether § 1983's history or purposes nonetheless counsel against recognizing the same immunity in § 1983 actions.") (citations and internal quotation marks omitted); *Heck v. Humphrey*, 512 U.S. 477, 491-95 n. 1, 114 S.Ct. 2364, 2375-76 n. 1, 129 L.Ed.2d 383 (1994) (Souter, J., concurring).

Therefore, we begin by examining the common law in 1871, when Congress enacted § 1983. This examination demonstrates that government officials at that time had no immunity for acts that were outside of the scope of their authority. For example, Blackstone's codification of the common law refers to the use of legal authority as a defense to an action in trespass: a defendant could argue that a trespass was justifiable "if [the] man comes thither ... to execute in a legal manner the process of the law." 3 William Blackstone, *Commentaries* *212. But in cases where a person entering land for a legal purpose "makes ill use of the authority with which the law entrusts him, he shall be accounted a trespasser *ab initio*." *Id.* at *213. Indeed, actions for malicious prosecution and false imprisonment allowed suit against government officials who exceeded their governmental authority. *See id.* at *126-38. *See also Payton v. New York*, 445 U.S.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

573, 592, 100 S.Ct. 1371, 1383, 63 L.Ed.2d 639 (1980) ("At common law, the question whether an arrest was authorized typically arose in civil damages actions for trespass or false arrest, in which a constable's authority to make the arrest was a defense. Additionally, if an officer was killed while attempting to effect an arrest, the question whether the person resisting the arrest was guilty of manslaughter or murder often turned on *whether the officer was acting within the bounds of his authority.*" (emphasis added) (citations omitted)).

[2] As the Supreme Court has noted, however, "it is the American rather than the English common-law tradition that is relevant." *Anderson v. Creighton,* 483 U.S. 635, 644 n. 5, 107 S.Ct. 3034, 3041 n. 5, 97 L.Ed.2d 523 (1987). An investigation of American common law at the time of the enactment of § 1983 establishes that in this country the Supreme Court followed British common law in holding government officials liable for acts outside of their authority.

For example, in *Mitchell v. Harmony,* 54 U.S. (13 How.) 115, 126 (1851), the Court drew a bright line between acts that were authorized by law, and those that were not: if a government officer seized property lawfully "the government is bound to make full compensation to the owner; but the officer is not a trespasser." 54 U.S. (13 How.) at 134. So long as the officer acted "honestly, and to the best of his judgment, the law will protect him." *Id.* If, however, the government officer acted beyond his authority, even "in his zeal for the honor and interest of his country ... [he] has trespassed on private rights." 54 U.S. (13 How.) at 135. *See also Little v. Barreme,* 6 U.S. (2 Cranch) 170, 179, 2 L.Ed. 243 (1804) (commander of American warship liable for seizure of Danish cargo ship on high seas because captain acted beyond scope of congressional grant of authority); *Wise v. Withers,* 7 U.S. (3 Cranch) 331, 337, 2 L.Ed. 457 (1806) (collector of militia fines commits trespass by attempting to collect fine from person exempt from military service); *Bates v. Clark,* 95 U.S. 204, 209, 24 L.Ed. 471

(1877) (rejecting argument that defendants, as government officials, should *592 not be liable because the "objection fatal to all this class of defences is that in that locality [the defendant officials] were utterly without any authority in the premises.... There was here no process from a competent court, nor any order from any source having authority, and there is, therefore, no defence.").

In short, in 1871 when Congress enacted § 1983, it was well recognized at common law that a government official who exceeded his authority enjoyed no immunity, but rather was civilly liable for money damages. Indeed, after carefully reviewing common law precedent, the Supreme Court reached precisely this conclusion in *Butz v. Economou,* 438 U.S. 478, 489-90, 98 S.Ct. 2894, 2902-03, 57 L.Ed.2d 895 (1978). Following a discussion of *Little,* 6 U.S. (2 Cranch) 170, and *Bates,* 95 U.S. 204, the Court observed that "[a]s these cases demonstrate,[at common law] a federal official was protected for action tortious under state law only if his acts were authorized by controlling federal law. 'To make out his defence he must show that his authority was sufficient in law to protect him.' " *Butz,* 438 U.S. at 490, 98 S.Ct. at 2902 (quoting *Cunningham v. Macon & Brunswick R. Co.,* 109 U.S. 446, 452, 3 S.Ct. 292, 297, 27 L.Ed. 992 (1883), and *Belknap v. Schild,* 161 U.S. 10, 19, 16 S.Ct. 443, 446, 40 L.Ed. 599 (1896)).

[3] Of course, we do not suggest that "the contours of official immunity ... should be slavishly derived from" rules of the common law. *Anderson,* 483 U.S. at 645, 107 S.Ct. at 3042. Once a court has established the state of the common law at the time Congress enacted § 1983, it must examine the history and purpose of § 1983 and "the special policy concerns involved in suing government officials." *Wyatt,* 504 U.S. at 164, 167, 112 S.Ct. at 1831, 1833 (citing *Harlow,* 457 U.S. at 813, 102 S.Ct. at 2735-36; *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 2815-16, 86 L.Ed.2d 411 (1985)).

We turn first to the history and purpose of § 1983. Nothing in either suggests that Congress intended

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 F.3d 582
106 F.3d 582, 36 Fed.R.Serv.3d 1196
**(Cite as: 106 F.3d 582)**

Page 15

government officials acting clearly beyond the scope of their authority to be immune from suits for money damages. The Supreme Court originally established absolute and qualified immunity under § 1983 because "[t]he legislative record gives no clear indication that Congress meant to abolish wholesale all common-law immunities." *Pierson v. Ray,* 386 U.S. 547, 554, 87 S.Ct. 1213, 1218, 18 L.Ed.2d 288 (1967); *see also Tenney v. Brandhove,* 341 U.S. 367, 376, 71 S.Ct. 783, 788, 95 L.Ed. 1019 (1951) (legislative immunity). The legislative record similarly gives no indication that Congress meant to *enlarge* common law immunities to include officials acting outside the scope of their authority.

Next, we consider "the special policy concerns involved in suing public officials." *Wyatt,* 504 U.S. at 167, 112 S.Ct. at 1833. McGraw argues that because of these policy concerns, an official should only be held to be acting beyond the limits of his authority when he commits acts "clearly established" to be beyond the scope of that authority. Although our sister circuits have not (at least to date) so held, we agree that government officials should be provided this additional protection. In *Harlow v. Fitzgerald* the Supreme Court held that even when government officials act illegally, they will not be held liable for civil damages if their conduct is objectively reasonable, i.e., if it "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The *Harlow* standard was created "lest[the] threat of liability 'dampen the ardor of all but the most resolute, or the most irresponsible [public officials], in the unflinching discharge of their duties.' " *Reynoldsville Casket Co. v. Hyde,* 514 U.S. 749, ----, 115 S.Ct. 1745, 1751, 131 L.Ed.2d 820 (1995) (interior quotation marks omitted) (quoting *Harlow,* 457 U.S. at 814, 102 S.Ct. at 2736).

This policy concern is equally important when considering when an official is to be held to have com-

mitted acts outside the scope of his authority. We certainly do not want public officials to shrink from fulfilling all of the duties even arguably within the scope of their authority out of fear that an incorrect interpretation of their duties would bar them from claiming qualified immunity. Holding an official not entitled to claim qualified*593 immunity for acts clearly established to be beyond the official's authority offers public officials some latitude to perform all of their duties. This rule is not so broad, however, that even those who are "plainly incompetent" or "knowingly violate the law" will nonetheless be allowed to claim qualified immunity. *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986). This accords with *Harlow* 's warning that the policy considerations that led to expanding qualified immunity should not be used to provide a "license to lawless conduct." *Harlow,* 457 U.S. at 819, 102 S.Ct. at 2738-39.

Thus, we hold that the policies that underlie *Harlow* similarly suggest that an official may claim qualified immunity as long as his actions are not clearly established to be beyond the boundaries of his discretionary authority.[FN3] This test is objective, and examines what a reasonable official in the defendant's position would have understood the limits of his statutory authority to be.

> FN3. Of course an official may still be liable for acts within his authority that violate clearly established law. *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738.

We also recognize that as a policy matter it will not always be fair to deny a defendant qualified immunity because government officials could not claim immunity for such behavior at common law. *See Anderson,* 483 U.S. at 646, 107 S.Ct. at 3042. To conclude that an official is not entitled to claim qualified immunity for acts clearly established to be beyond the scope of his authority, however, does not make the official responsible for knowledge of an arcane rule of nineteenth century law. Rather, all the official must know is the limit of his own au-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 F.3d 582
106 F.3d 582, 36 Fed.R.Serv.3d 1196
(Cite as: 106 F.3d 582)

thority. A government official does not need an extensive background in legal history to understand that he cannot claim qualified immunity when he acts totally beyond the scope of his authority. Thus, we jeopardize no public policy goal by requiring a government official to know the outer limits of his own authority and, in turn, holding him responsible for actions clearly established to be outside those limits.

[4] We hold, therefore, that an official who performs an act clearly established to be beyond the scope of his discretionary authority is not entitled to claim qualified immunity under § 1983. Multiple other statements of the Supreme Court support this conclusion. For example, in one of the first § 1983 qualified immunity cases, the Court relied on Justice Harlan's explanation that it is "the relation of the act complained of to matters committed by law to [the official's] control or supervision-which must provide the guide in delineating the scope of the rule which clothes the official acts of the executive officer with immunity...." *Scheuer v. Rhodes,* 416 U.S. 232, 247, 94 S.Ct. 1683, 1692, 40 L.Ed.2d 90 (1974) (quoting *Barr v. Matteo,* 360 U.S. 564, 573-74, 79 S.Ct. 1335, 1341, 3 L.Ed.2d 1434 (1959) (plurality opinion) (internal citations omitted)). This understanding of § 1983 qualified immunity has been manifest in subsequent cases. *See, e.g., Procunier v. Navarette,* 434 U.S. 555, 561-62, 98 S.Ct. 855, 859, 55 L.Ed.2d 24 (1978) (holding § 1983 immunity dependent upon "the scope of discretion and responsibilities of the office"); *Wood v. Strickland,* 420 U.S. 308, 318, 95 S.Ct. 992, 999, 43 L.Ed.2d 214 (1975) (same). Similarly, the Court in *Barr* quoted Judge Learned Hand's famous statement that "[t]he decisions have, indeed, always imposed as a limitation upon the immunity that the official's act must have been within the scope of his powers...." 360 U.S. at 572, 79 S.Ct. at 1340 (quoting *Gregoire v. Biddle,* 177 F.2d 579, 581 (1949), *cert. denied,* 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950)).

Our holding also accords with Fourth Circuit pre-

cedent, which has consistently limited entitlement to qualified immunity to "[g]overnment officials *who perform discretionary functions.*" *Bonner v. Anderson,* 81 F.3d 472, 475 (4th Cir.1996) (emphasis added); *see also Buonocore v. Harris,* 65 F.3d 347, 353 (4th Cir.1995) ("[O]fficials ... [are] accorded qualified immunity ... in the performance of discretionary duties."); *Price v. Sasser,* 65 F.3d 342, 345 (4th Cir.1995) ("government officials performing discretionary functions generally are shielded") (quoting *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738); *Slattery v. Rizzo,* 939 F.2d 213, 216 (4th Cir.1991) (Powell, J.) ("[g]overnment officials performing*594 discretionary functions are shielded from civil liability"); *Bright v. McClure,* 865 F.2d 623, 625 (4th Cir.1989) ("[P]ublic officials ... are clothed with qualified immunity in the performance of discretionary functions.").

We emphasize that public officials seldom use their offices to engage in conduct that is entirely beyond their discretionary authority. In fact, plaintiffs rarely assert that the defendant officials were not "acting pursuant to their job functions and within the scope of their authority." *See Jordan v. Doe,* 38 F.3d 1559, 1566 (11th Cir.1994). This is because most § 1983 claims involve conduct that relates to, or flows from, conduct that the official is indeed authorized to commit. However, when a government official does act totally beyond the scope of his authority, he received no immunity at common law and is entitled to none under § 1983.

### C.

We now turn to establishing a framework for discerning when a government official may not claim qualified immunity because he has exceeded his authority.

[5][6] Before permitting an official to claim qualified immunity a court must determine that the official's acts were not clearly established to be beyond the scope of his authority. The defendant official bears the burden of demonstrating that the conduct

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of which the plaintiff complains "falls within the scope of the defendant's duties." *Shechter v. Comptroller of New York,* 79 F.3d 265, 268 (2d Cir.1996); *Rich v. Dollar,* 841 F.2d 1558, 1563 (11th Cir.1988) (holding that for immunity an official "must first prove that 'he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'") (quoting *Zeigler v. Jackson,* 716 F.2d 847, 849 (11th Cir.1983)); *see also Mackey v. Dyke,* 29 F.3d 1086, 1095 (6th Cir.1994) (finding that "defendants bear the initial burden ... [of] show[ing] they were acting within their discretionary authority at the time in question"); *Gray v. Bell,* 712 F.2d 490, 502 n. 36 (D.C.Cir.1983) ("It is clear that the scope of authority requirement is a prerequisite to any application of official immunity whatever the level of protection asserted or the nature of the claim involved."); *Barker v. Norman,* 651 F.2d 1107, 1124-25 (5th Cir.1981) (to claim qualified immunity, a defendant official must show that "the complained-of actions were undertaken pursuant to the performance of his duties and within the scope of his discretionary authority"). But, in order to ensure that public officials are adequately protected from liability, an official's conduct falls within his authority *unless* a reasonable official in the defendant's position would have known that the conduct was clearly established to be beyond the scope of that authority.

[7][8][9] In determining the scope of an official's authority, and whether the act complained of was clearly established to be beyond that authority, the issue is neither whether the official properly exercised his discretionary duties, nor whether he violated the law. If these were the relevant inquiries, any illegal action would, by definition, fall outside the scope of an official's authority. *See Shechter,* 79 F.3d at 269. To equate "the question of whether the defendants acted lawfully with the question of whether they acted within the scope of their discretion" is "untenable." *Sims v. Metropolitan Dade Co.,* 972 F.2d 1230, 1236 (11th Cir.1992); *Barr,* 360 U.S. at 572, 79 S.Ct. at 1340 ("A moment's reflection shows [that such an approach] defeat[s] the

whole doctrine.") (quoting *Gregoire,* 177 F.2d at 581). Instead, a court must ask whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties. *Id.* The scope of immunity "should be determined by the relation of the [injury] complained of to the duties entrusted to the officer." *Doe v. McMillan,* 412 U.S. 306, 319-20, 93 S.Ct. 2018, 2028, 36 L.Ed.2d 912 (1973) (citing *Barr,* 360 U.S. at 573-74, 79 S.Ct. at 1340-41). An official acts beyond the scope of his authority only if the injury occurred during the performance of an act clearly established to be outside of the limits of that authority.

As an example of a court that properly focused upon the scope of the defendant's duties, consider *Sims v. Metropolitan Dade County,* 972 F.2d 1230 (11th Cir.1992). In **595** *Sims,* an employee alleged that his supervisors in the Dade County Department of Community Affairs unconstitutionally suspended him from work for three days solely because he had made inflammatory public statements. To determine whether the supervisors acted within the scope of their authority the Eleventh Circuit inquired whether suspending an employee was within the scope of the supervisors' discretionary duties, not, as the plaintiff employee urged, whether suspending an employee for exercising First Amendment rights was within the scope of those supervisory duties. *Id.* at 1236. The *Sims* court held that "[a]s supervisory employees of the Department, the [d]efendants' duties included the consideration of complaints about the conduct of Department employees, such as [plaintiff], and the administration of discipline" and for this reason, the "[d]efendants successfully established that they acted within the scope of their discretionary authority." *Id.*

[10] Similarly, the proper inquiry in the instant case is whether McGraw's action-forming his own "government agency" corporation under the auspices of the Attorney General's Office-was clearly established to be beyond the scope of his authority. The issue is *not* whether McGraw exceeded the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

scope of his authority by forming this corporation in retaliation for speech critical of him.

[11] In *Doe* and *Barr* the Supreme Court made clear that determination of the scope of an official's authority depends upon an analysis of the statutes or regulations controlling the official's duties. *See Doe,* 412 U.S. at 321-24, 93 S.Ct. at 2029-31 (carefully interpreting statutes dictating the duties of the Public Printer and Superintendent of Documents); *Barr,* 360 U.S. at 574-75, 79 S.Ct. at 1341-42 (analyzing duties of agency director under statute defining authority of agency). *See also Lenz,* 51 F.3d at 1546-47 (relying on both Florida statute that enumerates the duties of a guardian ad litem and training manual for Florida guardian ad litem program); *Krohn v. United States,* 742 F.2d 24, 30 (1st Cir.1984) (examining statutes that govern FBI duties).[FN4]

> FN4. McGraw argues that whether an action is clearly established to be beyond the scope of a public official's authority must, like a *Harlow* inquiry, be divined primarily from case law, and in the absence of specific case law to the contrary, an official must be held to have acted within the scope of his authority. There are several problems with this argument. First, McGraw's description of the *Harlow* inquiry is not wholly accurate; "there is no requirement that the exact right allegedly violated be previously specifically recognized by a court in order for it [to] be held clearly established for qualified immunity purposes." *Buonocore v. Harris,* 65 F.3d 347, 356-57 (4th Cir.1995) (interior quotation marks omitted). Second, although McGraw is correct that case law is frequently crucial to a *Harlow* inquiry, this is because *Harlow* focuses on the reach of clearly established statutory or constitutional rights, which often are only illuminated by case law. In contrast, the scope of a defendant official's authority will most frequently be

governed by statutes and regulations. Accordingly, whether an official's act was clearly established to be beyond the scope of his authority depends upon a review of the laws or regulations that governed his position at the time of the act. Any relevant case law, of course, should also be considered and accorded due weight. But, to require case law for this inquiry would grant many officials immunity for actions well beyond their statutory authority and rely on the faulty assumption that the limit of a government official's authority is generally defined by case law, rather than statutes or regulations.

[12] We turn, therefore, to an analysis of West Virginia law to determine whether a reasonable official in McGraw's position would have understood that establishing a "government agency corporation" was an act clearly established to be beyond the limits of his authority. West Virginia law narrowly circumscribes the powers of the Attorney General. Indeed, McGraw himself so held in an opinion he authored as a justice of the Supreme Court of Appeals of West Virginia. *See Manchin v. Browning,* 170 W.Va. 779, 296 S.E.2d 909, 914-17 (1982). *Manchin* held that under West Virginia law "the powers and duties of the Attorney General" are limited to those "specified by the constitution and by rules of law prescribed pursuant thereto." *Manchin,* 296 S.E.2d at 915. *See also State ex rel. McGraw v. Scott Runyan Pontiac-Buick, Inc.,* 194 W.Va. 770, 461 S.E.2d 516, 523 (1995) ("[T]he Attorney General's powers are limited to those specifically conferred by statute."). The *Manchin* court extensively reviewed the authority historically**596 granted the West Virginia Attorney General, and held that the Attorney General does not enjoy broad common law powers. *Manchin,* 296 S.E.2d at 915,*overruling State v. Ehrlich,* 65 W.Va. 700, 64 S.E. 935 (1909).

Therefore, governed by McGraw's own holding for West Virginia's highest court, we must consider whether establishing a corporation is one of the du-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ties "specified by the Constitution and by rules of law" for the Attorney General. *Id.* 296 S.E.2d at 915. The Constitution of West Virginia simply provides that the Attorney General "shall perform such duties as may be prescribed by law." W. Va. Const., art. 7, § 1 (1996). No West Virginia law expressly grants the Attorney General the right to establish a corporation, let alone a "government agency" corporation under the auspices of the Attorney General's office, and no West Virginia Attorney General has ever done so. McGraw concedes this.

What McGraw argues, however, is that W. Va.Code § 46A-7-102(1) implicitly provides this authorization, by permitting the Attorney General to "[r]eceive and act on complaints ... [and][e]stablish programs for the education of consumers." The crucial flaw in McGraw's argument is that forming a corporation is *not* establishing a "program," and the West Virginia legislature is well aware of the difference.

The West Virginia legislature has granted certain select government entities the power to create public corporations. *See* W. Va.Code § 5-26-4(13) (granting Governor's Cabinet on Children and Families power to "charter public and quasi-public corporations"); § 17-16B-11(b) (Public Port Authorities "authorized to create a quasi-public corporation"). In addition, the legislature has occasionally granted municipalities and counties the authority to charter public corporations. *See* W. Va.Code § 10-2-4a (granting municipalities power to create public corporation to act as park and recreation board); § 7-15-4 (granting counties power to create public corporations to provide ambulance services); § 7-17-9 (granting power to counties to create fire board as public corporation).

The power to create a public corporation, however, is clearly distinct from the power to establish a "program." Although the legislature has sparingly provided the authority to create public corporations, far more frequently it has permitted a state official or agency to establish a program. *See, e.g.,* W.

Va.Code § 5A-8-5 (state records administrator "shall establish and maintain a program for the selection and preservation of essential state records"); § 3-2-8(b)(2) (clerk of county commission shall establish program of voter registration); § 7-1-3aa (county commission "authorized and empowered to create a hazardous material accident response program"); § 7-4-6(d)(2) (West Virginia Prosecuting Attorneys Institute's duties include duty "to establish and implement general and specialized training programs"); § 7-7-2 ("attorney general is ... authorized ... to establish such inservice training programs [for prosecutors]"); § 7-148-9 (civil service commission shall "establish or prescribe a training program for correctional officers"); § 15-2-41 (commission has power and duty to "[d]evelop and maintain a comprehensive program to prevent drunk driving"); § 16-22-2 (state bureau of public health "authorized to establish and carry out a program designed to combat mental retardation... due to phenylketonuria, galactosemia, hypothyroidism, and certain other diseases"); § 16-24-2 ("state director of health shall establish and maintain a state hemophilia program"); § 18-2-11 ("state board [of education] shall ... establish ... a sabbatical leave program"); § 23-3-5 (worker's compensation division "authorized to establish an electronic transfer program"); § 29-6-27 (civil service commission division of department of personnel "shall establish a [leave donation] program"); § 31-18A-5(14) (housing development fund empowered "to establish and supervise [a building inspection] program").

[13] In sum, when the West Virginia legislature intends to grant a state officer, county, or municipality the power to create a corporation, it plainly so states. When the legislature intends to grant the lesser power to establish a "program," its language is equally clear. In W. Va.Code § 46A-7-102(1), the legislature only empowered the Attorney General to "establish programs." **597** As McGraw recognized when serving as Chief Justice of the West Virginia Supreme Court of Appeals, "[w]here the language of a statute is clear and without ambiguity

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 F.3d 582
106 F.3d 582, 36 Fed.R.Serv.3d 1196
(Cite as: 106 F.3d 582)

the plain meaning is to be accepted...." *Fraley v. Civil Service Comm'n*, 177 W.Va. 729, 356 S.E.2d 483, 484 (1987) (quoting *State v. Elder*, 152 W.Va. 571, 165 S.E.2d 108, 109 (1968)). Thus, we must agree with the district court that formation of a "government agency" corporation clearly exceeds the power § 46A-7-102(1) provides to the Attorney General.

The only other source of authority that McGraw relies on is his constitutionally-based oath of office. Pursuant to this oath, the Attorney General swears to "faithfully discharge the duties of his said office to the best of his skill and judgment." W. Va. Const. art. IV, § 5. McGraw claims that the oath empowered him to create his own "government agency" corporation.

In pursuing this argument, McGraw ignores the holding of West Virginia's highest court in *State ex rel. Fahlgren Martin v. McGraw*, 190 W.Va. 306, 438 S.E.2d 338 (1993), specifically rebuffing his prior effort to expand the Attorney General's limited powers on the basis of this very oath. In *Fahlgren Martin*, McGraw asserted that his oath authorized him to investigate and prosecute potential illegalities in state contracts submitted to him for review. *Id.* 438 S.E.2d at 343. The court unequivocally rejected this claim. Instead, it narrowly construed the oath's assignment of power, explaining that "the constitutional intent to promote good government does not grant the Attorney General the power or duty to investigate or prosecute [potential contractual illegalities]." *Id.* at 345. The court emphasized that the oath did not provide the Attorney General with any additional powers, explaining that "[a]s disappointing as it might be to any Attorney General ... the powers of the Attorney General [in West Virginia] are strictly defined by Constitution and statute. This court does not have the right to create powers which, based upon constitutional and legislative history, were never intended." *Id.* McGraw does not even attempt to distinguish *Fahlgren Martin*, or the similar ruling of *McGraw v. Caperton*, 191 W.Va. 528, 446 S.E.2d 921, 926 (1994),

which relied on *Fahlgren Martin*, to reject McGraw's claim that the West Virginia Attorney General has the power to bring a declaratory judgment action in his official capacity.

[14][15] McGraw points to no other source of authority empowering the Attorney General to form a "government agency" corporation, and we have found none.[FN5] This is entirely consistent with the fact that the West Virginia legislature, rather than its executive branch (or any member of that branch), is the body vested with the power to create government corporations. *See Sims v. Fisher*, 125 W.Va. 512, 25 S.E.2d 216, 228 (1943) (Public corporations are "the creature and arm of the State" and are "created by special act [of the legislature]."). "A public corporation is an instrumentality of the State, founded and owned by the State in the public interest, supported by public funds, and governed by managers deriving their authority from the State." *State ex rel. Sams v. Ohio Valley Gen. Hosp. Ass'n*, 149 W.Va. 229, 140 S.E.2d 457, 460 (1965). *See also White v. Berryman*, 187 W.Va. 323, 418 S.E.2d 917, 924 n. 15 (1992) (public corporations "are entities created by the legislature"); *Cowan v. County Comm'n of Logan County*, 161 W.Va. 106, 240 S.E.2d 675, 678 (1977) (legislature alone has power to create public corporations or municipalities, but the " 'Legislature may confer upon a court or some administrative officer or board the power to perform some judicial or ministerial act in the formation of such public corporations'.... The county commission, then, acts as an agency of the legislature performing a ministerial act in the formation of public corporations") (citing *West v. West Virginia Fair Ass'n.*, 97 W.Va. 10, 125 S.E. 353, 355-56 (1924)); *598Wiseman v. Calvert*, 134 W.Va. 303, 59 S.E.2d 445, 453 (1950) (same); W. Va. Const. art. VI, § 1 ("The legislative power shall be vested in a senate and house of delegates.").

> FN5. In fact, we have found no mention of a "government agency corporation" in the statutes, regulations, or case law of West

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 F.3d 582
106 F.3d 582, 36 Fed.R.Serv.3d 1196
(Cite as: 106 F.3d 582)

Page 21

Virginia, let alone any reference to "a body politic a corporate instrumentality of government with limited agency and quasi-sovereign capacity." The fact that McGraw created an entity heretofore unknown to West Virginia law, with personal funds no less, further evidences that he wandered far beyond the limits of his authority.

[16][17][18][19][20] As McGraw himself clearly proclaimed in *Manchin,* the duties of the West Virginia Attorney General are narrowly limited. 296 S.E.2d at 915. The Attorney General is not even the "chief law enforcement officer" of the state. *Id.* at 917. His role "is not to make public policy in his own right on behalf of the state." *Id.* at 920. Nor does his statutory authority authorize him "to assert his vision of state interest." *Id.* (citing *Motor Club of Iowa v. Dept. of Transportation,* 251 N.W.2d 510, 514 (Iowa 1977)). In light of these pronouncements, and the lack of any constitutional or statutory authority for McGraw's action, we hold that in forming his own "government agency" Better Government Bureau corporation McGraw performed an act a reasonable official in his position would have known was clearly established to be beyond the scope of his official duties. Accordingly, he cannot claim entitlement to qualified immunity for this conduct. The district court properly refused to grant McGraw summary judgment on this ground.[FN6]

> FN6. Without discussion, the district court noted that it "grant[ed] summary judgment to [BGB] on the issue of qualified immunity." *Better Gov't,* 904 F.Supp. at 553. In so stating, the court must have simply been emphasizing its denial of McGraw's motion for summary judgment on this issue. BGB did not move for, nor was it entitled to, affirmative relief on qualified immunity grounds. Qualified immunity is a *defense. Siegert v. Gilley,* 500 U.S. 226, 231, 111 S.Ct. 1789, 1792-93, 114 L.Ed.2d 277 (1991). All that BGB claimed was that

McGraw could not avail himself of that defense; the only relief BGB requested with regard to the qualified immunity issue was that the court deny McGraw's motion for summary judgment, which the court did.

## II.

## A.

We now turn to the second major question presented in these consolidated cases-whether the attorney-client privilege or the opinion work product doctrine protected the information BGB sought from Barbara Allen, Esquire. The parties do not dispute the facts giving rise to this question.

Shortly after the Jividen memorandum and the Hechler response surfaced, the Attorney General's Office retained Allen. A letter, dated January 5, 1996, from two Managing Deputy Attorneys General memorialized the engagement. The letter, written on official Attorney General's Office stationery, states that Allen is being retained "as an independent consultant to investigate a situation of possible document mismanagement and confidentiality/security breaches. At the end of your investigation we envision a written report including findings and recommendations." Later that same day, one of the deputies wrote Allen a second letter, also on official stationery, "to clarify that your appointment to investigate the possible mismanagement of documents and breach of confidentiality is in your capacity as a lawyer. You are hereby appointed as Special Counsel to the Attorney General for the purposes of that investigation."

In the next few days, in response to the parties' joint motion, we remanded the immunity appeal to the district court, and that court granted BGB permission to engage in additional discovery regarding the making and alleged destruction of the newly discovered documents. During the following weeks, BGB deposed McGraw, Hechler, Senior Assistant Attorney General Daynus Jividen, former Chief

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 F.3d 582
106 F.3d 582, 36 Fed.R.Serv.3d 1196
(Cite as: 106 F.3d 582)

Deputy Attorney General Fran Hughes, and Donna Willis (the secretary in the Attorney General's Office who leaked the Jividen memorandum to BGB).

Meanwhile, Allen plunged ahead, interviewing nine people: McGraw; Senior Assistant Attorneys General Charlene Vaughan, Larry Bohham, Carolyn Stafford, and Jividen; Hughes; McGraw's secretary, Jean Young; Hechler; and Willis. Allen conducted all interviews one on one, with no one present but Allen and the interviewee. Allen's notes and summaries of these interviews represent the sole records of these interviews. By the end of February, approximately seven weeks after being retained, Allen had expended between 70 to 100 hours on the project, with 20 to 25 hours spent in *599 investigation and the remainder on drafting her report and doing a "great deal" of legal research.

BGB timely served Allen with a subpoena duces tecum, noting her deposition for February 21, 1996. Allen moved to quash the subpoena asserting the work product doctrine and, on behalf of her client, the attorney-client privilege, and other privileges.

Immediately prior to Allen's scheduled deposition, the magistrate judge and the district court each held hearings and denied Allen's motion to quash, rejecting most of her privilege claims. Allen was ordered to attend the deposition and produce all documents responsive to the subpoena duces tecum that constituted fact work product. Allen was also instructed to prepare a privilege log detailing all other documents, or portions thereof, claimed to be protected from disclosure by attorney-client privilege or the opinion work product doctrine. The log was to set forth the date, author, and subject matter of all documents not produced and to indicate those individuals with whom all such documents had been shared. The court also directed Allen to submit any withheld documents that BGB challenged for in camera review.

When BGB took Allen's deposition on February 21, Allen declined to answer various questions or produce certain documents on the grounds of attorney-cli-

ent privilege and opinion work product. By February 23, Allen had prepared and filed a privilege log. She also simultaneously submitted the disputed documents to the court for in camera review.

On February 29, BGB moved to enforce the district court's previous orders. Again, the magistrate judge and the district court rejected the claim of attorney-client privilege for any of the documents. The magistrate judge did order that certain opinion work product be redacted from the documents; BGB does not challenge these redactions.

Allen continued to refuse to turn over most of the documents or to answer certain related questions on the grounds of attorney-client privilege and the opinion work product doctrine. Although acknowledging that Allen was acting in good faith, at her clients' behest, and to protect her clients' claims of privilege and opinion work product, BGB nonetheless moved that Allen be found in civil contempt.

After holding a hearing, the district court, on April 25, 1996, held Allen in civil contempt, and imposed a fine of $250.00 per day for each day she refused to comply with the court's orders. The district court refused Allen's request to stay the contempt sanctions pending appeal.

Allen and McGraw noted timely appeals of the district court's order rejecting the privilege claims and finding Allen in contempt. Allen also moved for a stay of the contempt sanctions pending appeal. On May 3, 1996, Judge M. Blane Michael, sitting as a single circuit judge, granted that motion and stayed the sanctions pending appeal. Prior to the entry of that order, Allen had paid $1,500.00 in fines pursuant to the district court's contempt sanction order. We expedited Allen and McGraw's appeals of the privilege issues and consolidated them with the qualified immunity appeal.

On appeal, Allen and McGraw maintain that attorney-client privilege, or the opinion work product doctrine, or both, prevent questions about, and dis-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 F.3d 582
106 F.3d 582, 36 Fed.R.Serv.3d 1196
(Cite as: 106 F.3d 582)

closure of, all or part of eighteen documents.[FN7] Attorney-client privilege is asserted as to sixteen of these documents. These include: (1) Allen's handwritten notes of interviews she conducted in January 1996 of McGraw and four of his assistant attorneys general, and her typed summaries of those notes (two sets of documents from each of five interviews, ten documents*600 in all (Document nos. 1, 2, and 5-12)); (2) a partial draft report that Allen prepared during early February 1996 (Document no. 19); (3) Allen's handwritten notes of her January 17, 1996 interview of the former Chief Deputy Attorney General and her typed summary of those notes (two documents, nos. 3 and 4); (4) handwritten notes prepared on January 3, 1996 by Deputy Attorney General Carolyn Stafford (Document no. 13); (5) a timeline of the activities of Donna Willis, which Stafford prepared at Allen's request (Document no. 14); and (6) a collection of certain employment records of Donna Willis (Document no. 20). Allen and McGraw also assert that portions of some of these documents constitute opinion work product. Attorney-client privilege is not asserted as to the remaining two documents-handwritten notes and a typed summary of Allen's January 18, 1996 interview with Secretary of State Hechler (Documents nos. 16 and 17). Allen and McGraw do maintain, however, that portions of these documents constitute opinion work product.

> FN7. Allen submitted twenty documents for in camera review but on appeal no claim of attorney-client privilege or opinion work product is asserted as to two of these documents: Allen's summaries of her interviews with Jean Young (Document no. 18) and Donna Willis (Document no. 15). Allen turned both of these documents over to BGB, after the magistrate judge had redacted the portions of them that he found to be opinion work product. BGB does not appeal these redactions. (Allen's assertion on appeal that part of Document no. 15 was outside the scope of the subpoena duces tecum is meritless. Therefore,

as the magistrate judge directed, that part of Document no. 15 must also be disclosed to BGB.)

B.

We turn first to the claim of attorney-client privilege made with regard to communications between members of the Attorney General's Office and Allen.

[21][22] Like all privileges, the attorney-client privilege "interferes with the truth seeking mission of the legal process," and therefore is not "favored." *United States v. Aramony,* 88 F.3d 1369, 1389 (4th Cir.1996). The Supreme Court, however, has expressly recognized that the attorney-client privilege enjoys a special position as "the oldest of the privileges for confidential communications known to the common law" and that the privilege serves a salutary and important purpose: to "encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981). Accordingly, if a party demonstrates that attorney-client privilege applies, the privilege affords all communications between attorney and client absolute and complete protection from disclosure. *See In re Grand Jury Proceedings,* 102 F.3d 748, 750 (4th Cir.1996) ("No doubt exists that under normal circumstances, an attorney's advice provided to a client, and communications between attorney and client are protected by attorney-client privilege.").

[23] A party asserting the privilege must demonstrate:

(1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 F.3d 582
106 F.3d 582, 36 Fed.R.Serv.3d 1196
(Cite as: 106 F.3d 582)

Page 24

attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

*United States v. Tedder,* 801 F.2d 1437, 1442 (4th Cir.1986) (quoting *United States v. United Shoe Machinery Corp.,* 89 F.Supp. 357, 358-59 (D.Mass.1950)), *cert. denied,*480 U.S. 938, 107 S.Ct. 1585, 94 L.Ed.2d 775 (1987).

BGB, as it forthrightly acknowledges, has never questioned "[i]n its numerous briefs on the contempt issues" that the Attorney General has established most of these criteria. *See* Brief of Appellees at 57.

Thus, BGB makes *no* claim that the Attorney General and his Office were not Allen's clients. (For this reason when referring to Allen's clients, we refer to McGraw and the Office interchangeably herein.) Nor does BGB assert that Allen is not a member of the bar, that the privilege was ever waived, or that any communications were made for the purpose of committing a crime or tort.FN8

> FN8. Nor does BGB maintain that the attorney-client privilege is inapplicable to communications between a governmental officer or entity and the officer or entity's attorney. The district court expressly held "governmental officials can rely on the attorney-client privilege to protect confidential communications in certain circumstances." *Better Gov't,* 924 F.Supp. at 733. That holding accords with the relevant authority. *See, e.g., Coastal States Gas Corp. v. Dep't. of Energy,* 617 F.2d 854, 863 (D.C.Cir.1980) ("[I]t is clear that an agency can be a 'client' and agency lawyers can function as 'attorneys' within the relationship contemplated by the privilege"); *Green v. Internal Revenue Service,*

556 F.Supp. 79, 85 (N.D.Ind.1982) (privilege is unquestionably applicable to relationship between government attorneys and administrative personnel), *aff'd,*734 F.2d 18 (7th Cir.1984); *Resolution Trust Corp. v. Diamond,* 137 F.R.D. 634, 643 (S.D.N.Y.1991) (government agencies may invoke privilege, but bear same burden as do private parties of establishing its applicability); *In the Matter of Grand Jury Subpoenas Duces Tecum,* 241 N.J.Super. 18, 574 A.2d 449, 454 (App.Div.1989) ("[W]e have no hesitancy in holding that the privilege is fully applicable to communications between a public body and an attorney retained to represent it."). *See also NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 153, 95 S.Ct. 1504, 1517-18, 44 L.Ed.2d 29 (1975).

*601 Rather, BGB focuses solely on Allen's role when the communications at issue occurred, and the purpose of those communications. BGB asserts that Allen acted as an investigator rather than as an attorney, and consequently, the client communications at issue here were not made for the purpose of securing legal services. The magistrate judge and the district court so held, concluding for this reason that the attorney-client privilege did not protect the communications between Allen and her clients made during the investigation.

[24][25] The parties agree that our standard of review is twofold. To the extent a district court's holding that the attorney-client privilege does not protect communications "rest[s] essentially on determinations of fact," we review those determinations for "clear error." *United States v. Aramony,* 88 F.3d at 1389 (quoting *Sheet Metal Workers Int'l Ass'n v. Sweeney,* 29 F.3d 120, 123 (4th Cir.1994)). Our review is *de novo,* however, to the extent the court's holding rests on application of controlling legal principles to the facts. *See In re Grand Jury Proceedings, Thursday Special Grand Jury,* 33 F.3d 342, 353 (4th Cir.1994). *See also In re Grand*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Jury Proceedings,* 102 F.3d at 751-52.

The principal error in the district court's holding is a legal one. The court apparently believed that if a client retains an attorney to perform the "rudimentary" task of conducting an investigation, that assignment can never constitute legal work and so the attorney-client privilege does not protect communications between the client and the investigating attorney. *Better Gov't,* 924 F.Supp. at 733 n. 5. The Supreme Court's landmark decision in *Upjohn* renders this theory untenable.

In *Upjohn,* a corporation's in-house general counsel conducted an internal "factual" investigation of "questionable payments" that some of the corporation's subsidiaries had made to foreign governments. 449 U.S. at 387-89, 101 S.Ct. at 681-82. This investigation, which involved in-house counsel requesting certain employees to complete a questionnaire and interviewing those and other employees, was the *only* legal work at issue in *Upjohn.* Explaining that the attorney-client privilege "exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice,"449 U.S. at 390, 101 S.Ct. at 683, a unanimous Supreme Court held that the privilege protected the questionnaires and the attorney-investigators' notes of their interviews with Upjohn employees. Although the focus of *Upjohn 's* analysis was on whether the scope of the privilege included communications to counsel by employees outside the corporation's "control group," the Court's affirmative answer to this question necessarily implies a recognition that an attorney's investigation may constitute a legal service, encompassed by the privilege.

Indeed, the Supreme Court in *Upjohn* expressly noted that "[t]he first step in the resolution of any legal problem is ascertaining the factual background and sifting through the facts with an eye to the legally relevant." *Id.* at 390-91, 101 S.Ct. at 683. By itself this statement demonstrates the defect in the district court's reasoning that "legal

counsel is not necessary" to perform the "rudimentary" function of conducting an investigation. *\*602Better Gov't,* 924 F.Supp. at 733 n. 5.[FN9]

> FN9. The district court's suggestion that the Attorney General's Office "likely has a staff of investigators" undermines rather than supports the court's conclusion that the Office did not hire Allen in her capacity as an attorney. *Better Gov't,* 924 F.Supp. at 733 n. 5. If the Attorney General's Office simply needed a lay investigator to collect and summarize information, it could have used its own staff and avoided the expense of retaining outside legal counsel. The very retention of outside counsel indicates that the Office wanted someone who could collect and "sift [ ] through the facts with an eye to the legally relevant." *Upjohn,* 449 U.S. at 390-91, 101 S.Ct. at 683.

But the *Upjohn* pronouncement hardly stands alone. Courts have consistently recognized that investigation may be an important part of an attorney's legal services to a client. *See, e.g., United States v. Rowe,* 96 F.3d 1294, 1297 (9th Cir.1996); *Dunn v. State Farm Fire & Casualty Co.,* 927 F.2d 869, 875 (5th Cir.1991) (applying Mississippi law); *In re Grand Jury Subpoena,* 599 F.2d 504, 510-11 (2d Cir.1979); *Diversified Indus. v. Meredith,* 572 F.2d 596, 606-10 (8th Cir.1977) (en banc hearing 1978); *Arcuri v. Trump Taj Mahal Assocs.,* 154 F.R.D. 97, 104 (D.N.J.1994); *In re Int'l Sys. & Controls Corp. Sec. Litig.,* 91 F.R.D. 552, 557 (S.D.Tex.1981), *vacated on other grounds,*693 F.2d 1235 (5th Cir.1982); *In re LTV Sec. Litig.,* 89 F.R.D. 595, 599-611 (N.D.Tex.1981); *In re Grand Jury Subpoena,* 478 F.Supp. 368, 371-73 (E.D.Wis.1979). Indeed, BGB itself relies on a case in which the court expressly held that "the attorney-client privilege encompasses factual investigations by counsel." *United States v. Davis,* 131 F.R.D. 391, 398 (S.D.N.Y.1990).[FN10]

> FN10. In *Davis,* a government contract

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

case, the government and the contractor sought documents from each other and each party asserted attorney-client privilege. In the course of its opinion, the court unremarkably recognized that for communications to be privileged, an attorney "must be functioning as an attorney" and that attorney-created documents whose "primary purpose" was "business negotiations" rather than "legal advice were not privileged." *Davis,* 131 F.R.D. at 401. The court also held, however, that the attorney-client privilege protected communications made by a government official to a FBI agent *investigating* a matter for government attorneys. *Id.* at 398. In fact, the *Davis* court concluded that *all investigative* materials were protected by either attorney-client privilege or the work product doctrine. *Id.* at 403-408. The only other cases BGB relies on to support its argument that investigation does not constitute legal work are *North American Mortgage Investors v. First Wisconsin Nat'l Bank of Milwaukee,* 69 F.R.D. 9 (E.D.Wis.1975), and *City of Virginia Beach v. U.S. Dep't of Commerce,* 805 F.Supp. 1323 (E.D.Va.1992), *aff'd in part, rev'd in part on other grounds,*995 F.2d 1247 (4th Cir.1993). Both cases concluded that the mere performance by a lawyer of a task does not privilege communications made during that task; neither holds (nor suggests) that an attorney's investigation never constitutes privileged legal work.

Of course, not all communications between an attorney and client during attorney-conducted investigations constitute legal work entitled to attorney-client privilege. For example, no privilege attaches when an attorney performs investigative work in the capacity of an insurance claims adjuster, rather than as a lawyer. *See Harper v. Auto-Owners Ins. Co.,* 138 F.R.D. 655, 671 (S.D.Ind.1991); *Mission Nat'l Ins. Co. v. Lilly,* 112 F.R.D. 160, 163

(D.Minn.1986). But even in these cases the courts did not suggest, let alone hold, that investigation can never constitute legal work. Quite the contrary, they carefully instructed that only "[t]o the extent" attorneys acted as claims adjusters, a "pure, ordinary business function," was their investigation "outside the scope of the asserted privileges." *Mission Nat'l,* 112 F.R.D. at 163. *See also Harper,* 138 F.R.D. at 671 ("To the extent this attorney acted as a claims adjuster, claims process supervisor, or claim investigation monitor, and not as a legal advisor, the attorney-client privilege would not apply.").

Thus, even these cases are entirely consistent with the great body of law holding that confidential communications made to attorneys "hired to investigate through the trained eyes of an attorney" are privileged. *In re International Sys.,* 91 F.R.D. at 557. As the court explained in *In re LTV Securities Litig.,* when rejecting the argument that the privilege should not apply when the attorneys involved performed an "investigative rather than strictly legal" function:

> [W]hile in house accountants or lay investigators could have been employed to investigate the events in question, neither would have brought to bear the same training, **\*603** skills and background possessed by attorneys and necessary to make the professional independent analysis and legal recommendations sought by the LTV Board of Directors.

89 F.R.D. at 600-01. In sum, *Upjohn* made "clear that fact finding which pertains to legal advice counts as professional legal services." *Rowe,* 96 F.3d at 1297 (internal citations omitted). *See also In re Grand Jury Subpoena,* 599 F.2d at 510 (investigation by law firm retained to investigate and provide legal advice based on that investigation "trigger[s] the attorney-client privilege").[FN11]

> FN11. Our good colleague in dissent suggests that because Allen was engaged to investigate the Attorney General's Office, communications made between Allen and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

employees of that Office, who may have been "targets" of the investigation, should not be protected by attorney-client privilege. *Upjohn* forecloses this contention. In *Upjohn,* counsel for a corporation sought and obtained information from numerous employees of that corporation as part of an investigation of "possibly illegal" payments made by the corporation to foreign government officials. 449 U.S. at 386, 101 S.Ct. at 681. The *Upjohn* employees who were interviewed by the corporation's counsel were in precisely the same position as the employees of the Attorney General's Offices whom Allen interviewed. The Supreme Court held that the attorney-client privilege protected communications between Upjohn's counsel and its employees, regardless of rank, because the communications were made in order to formulate and render legal advice to the corporation itself. *Id.* at 389-397, 101 S.Ct. at 682-86. Neither the dissent nor BGB claim that a governmental entity cannot avail itself of attorney-client privilege to the same extent as a corporation. *See supra* n. 8. Of course, the *underlying facts* communicated between a corporate or governmental entity's employees and its counsel are not privileged and BGB, like the Government in *Upjohn,* 449 U.S. at 395, 101 S.Ct. at 685, is free to obtain these facts by questioning the same employees.

[26][27] Accordingly, we must reject the legal theory espoused by district court that the attorney-client privilege does not apply here, simply because Allen's assigned duties were investigative in nature.FN12 The relevant question is not whether Allen was retained to conduct an investigation, but rather, whether this investigation was "related to the rendition of legal services." *Dunn,* 927 F.2d at 875. If it was, and it clearly was here, then "[t]he privilege is not waived." *Id. See also Rowe,* 96 F.3d at 1297.

FN12. The district court also concluded that the "general policies favoring disclosure" in 42 U.S.C. § 1983 cases create an extra barrier for a § 1983 defendant asserting attorney-client privilege. *Better Gov't,* 924 F.Supp. at 733-34. There is no support for this legal theory either. In the cases upon which the district court and BGB rely, the courts refused to recognize or extend *other* privileges because to do so would prevent civil rights plaintiffs from discovering critical *facts. See, e.g., Skibo v. City of New York,* 109 F.R.D. 58, 63-64 (E.D.N.Y.1985) (claims of "self critical analysis" privilege and executive privilege did not bar discovery of Internal Affairs Division's Procedural Manual and employee effectiveness evaluations in excessive force case when documents sought were the "only available source of the information"). The rationale of those cases does not apply here, even by analogy, because, as noted within, the attorney-client privilege does not protect underlying facts, only attorney-client communications about these facts. *Upjohn,* 449 U.S. at 395, 101 S.Ct. at 685. Thus, no privilege prevents BGB from interviewing, indeed deposing, every witness Allen interviewed, and so obtaining the same facts. What BGB may not do is ask Allen or her clients what they said to each other.

[28] To the extent the district court's conclusion to the contrary constituted a factual finding, it was clearly erroneous. Examination of the record permits only one conclusion: Allen was retained to conduct an investigation using her legal expertise. Abundant evidence unequivocally supports this conclusion, and no evidence contradicts it.

In reaching a contrary conclusion, the district court appeared to rely on the engagement letters, and Allen's similar description of her charge set forth in her motion to quash the subpoena. *Id.*FN13 The

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

first engagement*604 letter, dated January 5, 1996, signed by Managing Deputy Attorneys General Deborah Henry and William Steele states:

> FN13. The district court may also have relied on two newspaper articles that characterize Allen as a "special investigator." *Id.* The articles, of course, constitute unsworn hearsay, entitled to no weight. *See, e.g., Pan-Islamic Trade Corp. v. Exxon Corp.,* 632 F.2d 539, 556-57 (5th Cir.), *reh'g denied,* 642 F.2d 1210 (5th Cir.1981), *cert. denied,* 454 U.S. 927, 102 S.Ct. 427, 70 L.Ed.2d 236 (1981). BGB does not make any serious argument to the contrary but simply asserts that consideration of them, if error, was harmless. Even if credited, the articles hardly prove Allen acted solely as an investigator, rather than as a lawyer using legal expertise to conduct an investigation; the articles described Allen as a lawyer who had been "hired to investigate" and "provide a report as quickly as possible." Associated Press, *McGraw Hires Investigator,* Charleston Daily Mail, January 6, 1996; Associated Press, *West Virginia Investigating Missing File Case,* The Columbus Dispatch, January 6, 1996.

Thank you for meeting with us yesterday. Based upon our discussions, we would like to retain you as an independent consultant to investigate a situation of possible document mismanagement and confidentiality/security breaches. At the conclusion of your investigation we envision a written report including findings and recommendations.

This is to confirm that we agreed upon an hourly rate of $125.00 for your services.

The second letter, which Henry alone sent by facsimile later the same day, states:
I am writing to clarify that your appointment to investigate the possible mismanagement of documents and breach of confidentiality is in your capacity as a lawyer. Thus, you are hereby appointed as Special Counsel to the Attorney General for the purpose of that investigation.

In the memorandum in support of her motion to quash, Allen echoed that she had been appointed as "Special Counsel to the Attorney General for the purpose of investigating possible breach[es] of confidentiality within the Office of the Attorney General and possible mismanagement of documents within the Office of the Attorney General."

[29] The district court apparently regarded the second engagement letter's statement that Allen was hired in her "capacity as a lawyer" as an after-the-fact, self-serving attempt to shield relevant, damaging facts from disclosure and so refused to be bound by this statement. *Better Gov't,* 924 F.Supp. at 733. Of course, attorney-client privilege is never "available to allow a [client] to funnel its papers and documents into the hands of its lawyers for custodial purposes and thereby avoid disclosure." *Radiant Burners v. American Gas Ass'n,* 320 F.2d 314, 324 (7th Cir.), *cert. denied,* 375 U.S. 929, 84 S.Ct. 330, 11 L.Ed.2d 262 (1963). But we find it difficult to understand why the second letter is suspect in view of the fact that, as BGB acknowledges, it was sent the same day as the first letter, and *before Allen conducted any interviews.* Since attorney-client privilege protects only the disclosure of client communications, and not the disclosure of any underlying facts, *Upjohn,* 449 U.S. at 395, 101 S.Ct. at 685, a client cannot possibly hide *information* simply by communicating it to his lawyer; BGB could have simply deposed each of the parties that Allen interviewed and discovered this information itself.

However, with or without the second letter, a court cannot reasonably infer from the record in this case that Allen acted as an "investigator solely and not as both investigator and lawyer." *Better Gov't,* 924 F.Supp. at 733 n. 5. Rather, the record clearly indicates, as both the first engagement letter and Allen's description of her task in her motion to quash expressly state, that the Attorney General's Office retained a lawyer, Allen, to investigate and prepare "a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 F.3d 582
106 F.3d 582, 36 Fed.R.Serv.3d 1196
**(Cite as: 106 F.3d 582)**

written report including findings and recommenda-
tions." Obviously, as BGB points out, Allen's status
as an attorney, is not, in itself, sufficient to estab-
lish she was hired to do legal work. But just as ob-
viously, clients often do retain lawyers to perform
investigative work because they want the benefit of
a lawyer's expertise and judgment. As *Upjohn* and
its progeny demonstrate, if a client retains an attor-
ney to use her legal expertise to conduct an invest-
igation, that lawyer is indeed performing legal work.

In addition to the documents upon which the dis-
trict court seemed to rely, *i.e.* the engagement letter
and the motion to quash, other evidence, apparently
not examined by the district court, further supports
the conclusion that the Attorney General's Office
retained Allen to use her legal talents and judgment
in conducting the investigation. For example, at de-
position, in response to questions from BGB's
counsel, Allen explained that of the 70 to 100 hours
this assignment consumed, she spent only 20 to 25
hours on investigation *per se*, spending the re-
mainder of her time on legal tasks-researching legal
issues, preparing memoranda of interviews, and
composing her written report. BGB did not and
does not suggest *605 that Allen lied in so testify-
ing under oath. Nor did BGB offer any evidence
contrary to this testimony.

Similarly, William Steele, one of the two Managing
Deputies who signed the letter retaining Allen,
stated in a sworn affidavit that "Mrs. Allen was
specifically asked not only to investigate but also to
make findings and recommendations to the Attor-
ney General and the Office. We anticipated that her
findings and recommendations would be based on
her investigation, her factual and legal analysis, and
her experience as an attorney." Steele emphasized
that "there was and is no question in my mind that
[Allen] was retained in her capacity as an attorney."

Furthermore, Allen's interview memoranda evid-
ence that her understanding of the underlying *legal*
issues dictated the direction of the interviews. Ad-
ditionally, examination of the draft of Allen's report

indicates it is not the type of report one would ex-
pect of a lay investigator. Rather, the report, though
incomplete, contains legal conclusions as to past
events, as well as recommendations for future con-
duct, conclusions which only a lawyer is qualified
to make.

In short, when controlling legal principles are ap-
plied to the undisputed record evidence, a court
must conclude that the Attorney General's Office
retained Allen to conduct an investigation in her ca-
pacity as an attorney, for the purpose of providing
legal services and advice. Therefore, the attorney-cli-
ent privilege protects all communications between
Allen and the attorneys in the Attorney General's
Office that occurred in connection with her invest-
igation. For this reason, Allen need not respond to
questions regarding the substance of these commu-
nications, and she need not produce her notes or
summaries of interviews of McGraw or any of his
assistants (Document nos. 1, 2, 5-12) or her draft
report (Document no. 19), all of which constitute
privileged communications between attorney and
client.

C.

The attorney-client privilege is also claimed for
several other communications.

First, it is asserted that the privilege protects Allen's
notes and summaries of her interviews of Fran
Hughes, a former Chief Deputy Attorney General
(Document nos. 3 and 4). Although Hughes served
as a member of the Attorney General's Office dur-
ing the time frame relevant to the activities Allen
investigated, Hughes was not employed by the Of-
fice at the time of her interview with Allen.

BGB does not assert that communications with
former employees should be entitled to any less
protection than communications with a client's cur-
rent employees receive. The Supreme Court in *Up-
john* left open the question of whether the scope of
the attorney-client privilege extends to include

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

communications with former, as well as current, employees. 449 U.S. at 394 n. 3, 101 S.Ct. at 684 n. 3. However, in a concurring opinion, Chief Justice Burger indicated his belief that the privilege should apply to communications by former employees: "in my view the Court should make clear now that, as a general rule, a communication is privileged at least when, as here, an employee or former employee speaks at the direction of the management with an attorney regarding conduct or proposed conduct within the scope of employment." *Id.* at 402-03, 101 S.Ct. at 689 (Burger, C.J., concurring).

Most lower courts have followed the Chief Justice's reasoning and granted the privilege to communications between a client's counsel and the client's former employees. *See In re Coordinated Pretrial Proceedings in Petroleum Prod. Antitrust Litig.,* 658 F.2d 1355, 1361 n. 7 (9th Cir.1981) (The *Up-john*"rationale applies to the exemployees ... involved in this case. Former employees, as well as current employees, may possess the relevant information needed by corporate counsel to advise the client ...."), *cert. denied,*455 U.S. 990, 102 S.Ct. 1615, 71 L.Ed.2d 850 (1982); *Admiral Ins. Co. v. United States Dist. Ct. for Dist. of Arizona,* 881 F.2d 1486, 1493 (9th Cir.1989) (relying on *Co-ordinated Pretrial Proceedings* ); *Porter v. Arco Metals Co.,* 642 F.Supp. 1116, 1118 (D.Mont.1986)(*Upjohn* indicates that "the attorney-client privilege may extend to [defendant's] former employees ... [with regard to their *606 communications with] the company's counsel."); *United States v. King,* 536 F.Supp. 253, 259 (C.D.Cal.1982) ("[The attorney-client] relationship existed even though [the witness] was not an employee of [the client] at the time of the conversation."), *overruled on other grounds by United States v. Zolin,* 842 F.2d 1135 (9th Cir.1988); *Am-arin Plastics v. Maryland Cup Corp.,* 116 F.R.D. 36, 41 (D.Mass.1987) ("In some circumstances, the communications between a former employee and a corporate party's counsel may be privileged.").FN14

FN14. Those courts that have denied the privilege to communications between the client's attorney and former employees have generally been following state law or concluded that the former employee had ceased being employed by the client *before* the relevant conduct occurred. *Nakajima v. General Motors,* 857 F.Supp. 100, 104 (D.D.C.1994) (D.C.law); *Barrett Industrial Trucks v. Old Republic Ins. Co.,* 129 F.R.D. 515, 517-18 (N.D.Ill.1990) (Illinois law); *Connolly Data Sys. v. Victor Technologies,* 114 F.R.D. 89, 93-94 (S.D.Cal.1987) (California law). Of course, state law does not apply in this § 1983 action, and it is undisputed that the Attorney General's Office did employ Hughes during the relevant time frame.

In light of the purpose underlying the privilege, this conclusion seems warranted. The Supreme Court has explained that the attorney-client privilege "rests on the need for the advocate and counselor to know all that relates to the client's reasons for seeking representation if the professional mission is to be carried out." *Trammel v. United States,* 445 U.S. 40, 51, 100 S.Ct. 906, 913, 63 L.Ed.2d 186 (1980). The Court reiterated this "need to know" focus in *Upjohn:* "the privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice." 449 U.S. at 390, 101 S.Ct. at 683. In rejecting the "control group" test for determining which employees are within the scope of a corporation's attorney-client privilege, the *Upjohn* Court recognized that "it will frequently be employees beyond the control group ... who will possess the information needed by the corporation's lawyers." *Id.* at 391, 101 S.Ct. at 683.

[30][31] Accordingly, we hold that the analysis applied by the Supreme Court in *Upjohn* to determine which employees fall within the scope of the privilege applies equally to former employees. In this

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 F.3d 582
106 F.3d 582, 36 Fed.R.Serv.3d 1196
(Cite as: 106 F.3d 582)

case, the Attorney General's Office employed Hughes during the time period in question and she possessed information relevant to Allen's investigation. Allen interviewed Hughes at the direction of her client, in order to provide legal advice to her client. Moreover, Allen needed the information that Hughes could provide in order to develop her legal analysis for her client. Consequently, Allen's notes and summary of her interview with Fran Hughes (Document nos. 3 and 4) are protected, and Allen need not answer questions regarding her interview with Hughes.

[32] The attorney-client privilege is also claimed to protect the collection of certain employment records of Donna Willis (Document no. 20). Although attorneys in the Attorney General's Office created portions of these documents, the records do not contain communications by those attorneys to Allen for her legal advice. Indeed, most of these records appear to pre-date Allen's engagement. Accordingly, the attorney-client privilege does not protect Document No. 20.

The last two documents for which the attorney-client privilege is asserted are certain handwritten notes (Document no. 13) and a timeline of Donna Willis' activities (Document no. 14). Although the table of contents to the documents submitted for in camera review states that Document no. 13 consists of "handwritten notes prepared on January 3, 1996 *by* Carolyn Stafford," the summary of this document states that it consists of "Handwritten Interview Notes of Interview *with* Carolyn Stafford, Deputy Attorney General." The document itself includes five pages of handwritten notes in which the author is unnamed; two pages of the notes seem to be dated, "4-10-95" and "6-7-95," well before the date on which Allen was retained, January 3, 1996. For this reason, we simply cannot determine from examination of the record the author, purpose, or timeframe of these notes and so cannot determine whether attorney-client privilege applies. On remand, the district court should *607 make these determinations. Only if the court concludes that the

notes were prepared by Allen, or by a member of the Attorney General's Office at her request, *after* that Office retained her, and that the notes were to assist her in performing the investigation and giving advice to her client, does attorney-client privilege attach. Otherwise, no privilege applies.

Document no. 14, the "Timeline for Donna Willis prepared by Carolyn Stafford at Barbara Allen's request" presents similar problems. While not mislabelled, neither the table of contents, nor the summary, nor the timeline itself, indicate *when* Stafford prepared the timeline for Allen. This deficiency again prevents us from determining whether the privilege protects the timeline. If Stafford prepared the timeline *prior* to the time that the Attorney General's Office retained Allen, the document is not privileged; if a member of the Attorney General's Office prepared the timeline for Allen after she was retained to aid her in performing her investigation and report, the timeline is privileged. Again, we leave these determinations to the district court's careful analysis on remand.

### D.

Finally, we address Allen's claims that opinion work product protects some of the documents submitted for in camera review. Because we have already held attorney-client privilege applies to certain documents or because the opinion work product doctrine is not asserted as a shield to discovery, this inquiry involves only three documents. These are: Allen's handwritten notes of and typewritten summary of her interview with Secretary of State Hechler (Document nos. 16 and 17), and Allen's selection and collection of certain of Donna Willis' employment records (Document no. 20).

[33] In contrast to *fact* work product, which is discoverable "upon a showing of both a substantial need and an inability to secure the substantial equivalent of the materials by alternate means without undue hardship,"*opinion* work product "enjoys a nearly absolute immunity and can be discovered

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

only in very rare and extraordinary circumstances." *In re Grand Jury Proceedings, Thursday Special Grand Jury,* 33 F.3d 342, 348 (4th Cir.1994). *Accord National Union Fire Ins. v. Murray Sheet Metal,* 967 F.2d 980, 984 (4th Cir.1992). *See also*Fed.R.Civ.P. 26(b)(3). Courts carefully guard opinion work product from disclosure to an opposing party, fearing that otherwise "[a]n attorney's thoughts, heretofore inviolate, would not be his own." *Hickman v. Taylor,* 329 U.S. 495, 511, 67 S.Ct. 385, 393-94, 91 L.Ed. 451 (1947). Furthermore, revealing an attorney's thoughts and opinions to an opposing party runs contrary to the principles underlying the adversary process. "Discovery was hardly intended to enable a learned profession to perform its functions ... on wits borrowed from the adversary." *Hickman,* 329 U.S. at 516, 67 S.Ct. at 396 (Jackson, J., concurring). If courts failed to protect opinion work product, lawyers would lose the incentive to do thorough research, relying instead on the opposing party's effort; clients and our adversary system would suffer as a result.

[34][35] To qualify for protection under the work product doctrine, a lawyer must create the document in anticipation of litigation. *In re Grand Jury Proceedings,* 33 F.3d at 348. Once that threshold is met, opinion work product is that which contains an attorney's "mental impressions, conclusions, opinions or legal theories ... concerning the litigation." *National Union,* 967 F.2d at 984 (internal quotation marks omitted). If material constitutes opinion work product it is "absolutely immune from discovery" whether it was "actually prepared by the attorney or another representative of the party." *Id.* (internal quotation marks omitted). With these principles in mind, we turn to examination of the three documents at issue here.

Most of Document no. 16, Allen's handwritten notes of her interview with Hechler, has already been produced. Allen does seek to shelter, as opinion work product, a portion of page 2 of this document. In describing this item in the material submitted for in camera review, Allen states, "[t]he entry

[is] covered with editing tape which I couldn't get off; however, the entry can be read[ ] if the page *608 [of the original document] is held up to the light." We have examined the record for this entry-the original documents submitted for in camera review are missing. Accordingly, we cannot make any assessment as to this document. On remand, the district court, in view of the principles set forth within, should assess whether this entry constitutes opinion work product.

[36] Document no. 17 is Allen's typewritten summary of her interview with Secretary of State Hechler. BGB has already received certain redacted portions of this document. Allen seeks to prevent disclosure of the remainder of the document. Clearly Allen prepared the summary in anticipation of litigation. She was hired in the midst of this very litigation because her client failed to produce a relevant document requested in discovery; part of her charge was to investigate why this happened and make recommendations for the future. Moreover, as the district court recognized, all parties anticipated further litigation growing out of Donna Willis' discharge. Not only did Allen prepare the document in anticipation of litigation, but the information Allen gained from Hechler, later memorialized in her interview summary, tends to indicate the focus of her investigation, and hence, her theories and opinions regarding this litigation. *See Upjohn,* 449 U.S. at 399, 101 S.Ct. at 687 ("Forcing an attorney to disclose notes and memoranda of witnesses' oral statements is particularly disfavored because it tends to reveal the attorney's mental processes."). *Accord Cox v. Administrator U.S. Steel & Carnegie,* 17 F.3d 1386, 1422 (11th Cir.) ("In *Upjohn,* the Supreme Court made clear that an attorney's notes and memoranda of a witness's oral statements is considered to be opinion work product."), *modified on reh'g,*30 F.3d 1347 (11th Cir.1994), *cert. denied,*--- U.S. ----, 115 S.Ct. 900, 130 L.Ed.2d 784 (1995). For these reasons, we agree with Allen that the contested portions of this document constitute opinion work product; she need not disclose them.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[37] Finally, we turn to Document no. 20. It contains pages of selected employment records concerning Donna Willis, which Allen requested that Carolyn Stafford and Charlene Vaughn provide to her. We have held that attorney-client privilege does not protect these records. Yet, just as Allen prepared the interview notes and summaries in anticipation of litigation, she also chose and arranged these records in anticipation of litigation. This choice and arrangement constitutes opinion work product because Allen's selection and compilation of these particular documents reveals her thought processes and theories regarding this litigation. *See, e.g., Shelton v. American Motors Corp.,* 805 F.2d 1323, 1329 (8th Cir.1986) ("In cases that involve reams of documents and extensive document discovery, the selection and compilation of documents is often more crucial than legal research.... We believe [counsel's] selective review of [her clients'] numerous documents was based on her professional judgment of the issues and defenses involved in this case."); *Sporck v. Peil,* 759 F.2d 312, 316 (3d Cir.) ("We believe that the selection and compilation of documents in this case in preparation for pretrial discovery falls within the highly-protected category of opinion work product."), *cert. denied,*474 U.S. 903, 106 S.Ct. 232, 88 L.Ed.2d 230 (1985). *See also James Julian v. Raytheon Co.,* 93 F.R.D. 138, 144 (D.Del.1982) ("In selecting and ordering a few documents out of thousands counsel could not help but reveal important aspects of his understanding of the case.").

Thus, the opinion work product doctrine protects Document no. 20 from disclosure. We emphasize that this conclusion does *not* protect Donna Willis' personnel records from disclosure, just Allen's selection and arrangement of them. BGB remains free to seek, by proper discovery request, Willis' personnel records, as well as any witness's sworn testimony or any other factual material.

III.

In sum, with regard to the qualified immunity appeal, No. 96-1652, we affirm the district court's denial of McGraw's motion for summary judgment. As for the appeals of the contempt order, Nos. 96-1464 and 96-1601, we reverse and remand. We hold that attorney-client privilege protects disclosure of the notes and summaries of Allen's interviews*609 with attorneys in the Attorney General's Office, including former Chief Deputy Hughes, as well as the draft of her report. (Document nos. 1-12 and 19). BGB cannot force Allen to answer questions regarding those interviews and that report. Further, the opinion work product doctrine protects the portions of Allen's typed summary of her interview with Hechler that BGB has not previously received, as well as Allen's collection and selection of Donna Willis' employment records. (Document nos. 17 and 20). We, therefore, reverse the district court's order holding Allen in contempt. We remand the case for the district court to make the further privilege determinations with regard to Document nos. 13, 14, and 16 in accordance with this opinion.

No. 96-1652 is *AFFIRMED.*

Nos. 96-1464 and 96-1601 are *REVERSED AND REMANDED.*

NIEMEYER, Circuit Judge, concurring in part and dissenting in part:

I concur in part I and part II D of the opinion for the court; I dissent from parts II A-C addressing the district court's application of the attorney-client privilege.

The party asserting the attorney-client privilege carries the burden of establishing, *inter alia,* that he is a client; that the person to whom the communication was made was acting as an attorney; that the communications for which he claims the attorney-client privilege were confidential and took place between him and his lawyer and concerned matters on which the lawyer was representing him; that the communication was not for the purpose of committing a crime or tort; and that he has not waived the privilege. While I do not disagree with many of the legal principles announced by the majority with re-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

spect to the nature and scope of the attorney-client privilege, I conclude that the majority has failed to apply its own principles correctly to the circumstances of this case.

Following hearings and the examination of relevant documents, the district court was not persuaded that Barbara Allen was acting as an attorney in her work for the West Virginia Attorney General's office. The district court examined the circumstances leading up to Allen's engagement and the engagement documentation and concluded that "the court is concerned about the bona fides of McGraw's claim that Barbara Allen was hired and retained as an attorney." The majority has simply sidestepped this conclusion and substituted its own. Moreover, the majority has not addressed the question of whether Allen was retained to do the work of an attorney. Apparently the Attorney General hired her in response to leaks of documentation revealing potential misconduct by the Attorney General with the purpose of discovering the source of the leaks and disciplining the offending persons. Such work could have been done equally by an investigator, detective, or police officer. As the district court found, however, the Attorney General elected to engage Allen with the purpose of shielding from public view the product of such an investigation. Against these facts, I do not believe we can conclude that the district court erred.

At least as troubling to me is the unwillingness of the majority to focus on the identity of Allen's client. The Attorney General claims that the client was the Attorney General and the Attorney General's office. The purpose of the investigation, however, was to investigate *the Attorney General's office* and discover who was leaking information. Thus, the Attorney General would have to be urging that Barbara Allen was retained to represent both the investigator and the targets of the investigation. The majority is correct to note that a governmental entity can avail itself of *Upjohn* 's protections. Op. at 603, n. 11. But *Upjohn* 's shield protects an entity's ability to use its employees in the formulation of its

own legal position. In this case, in contrast, the employees were the *targets* of Allen's investigation and so had interests which are clearly adverse to the person the majority considers to be their own attorney. The majority's reasoning thus extends *Upjohn* 's privilege to protect an entity's attorney's discussions with adverse persons.

If the targets of the investigation were not clients, as I would suppose, then the attorney-client privilege would not protect notes of Allen's interviews with these persons under*610 the long-standing line of cases cited by the majority that leaves unprotected factual investigations that do not involve typical attorney work. *See, e.g., Harper v. Auto-Owners Ins. Co.,* 138 F.R.D. 655, 671 (S.D.Ind.1991); *Mission Nat'l Ins. Co. v. Lilly,* 112 F.R.D. 160, 162-63 (D.Minn.1986). If, on the other hand, we were to suppose that the targets of Allen's investigation were also her clients, then we have the unseemly and perhaps illegal suggestion that Allen was representing two opposite sides of a potentially illegal activity. Moreover, she would be in the untenable position of revealing the communications of her clients (the targets of the investigation) to those who would discipline them.

While the majority has stated general principles of attorney-client privilege with which no one can disagree, it has simply not come to grips with the nature of the engagement, the identity of the client, the absence of communications between attorney and client that did not conceal illegal activity or concerning which the privilege has not been waived.

In such a complex factual circumstance which involves numerous documents, we should defer to the district court which has become familiar with the factual context and documents and has had to make factual findings and legal judgments based on its knowledge. I would not find any of the district court's findings clearly erroneous, nor do I disagree with the district court's rulings that addressed the attorney-client privilege. Accordingly, I would affirm the district court's rulings on the attorney-cli-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 F.3d 582
106 F.3d 582, 36 Fed.R.Serv.3d 1196
**(Cite as: 106 F.3d 582)**

ent privilege issues.

C.A.4 (W.Va.),1997.
In re Allen
106 F.3d 582, 36 Fed.R.Serv.3d 1196

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.